**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE COLUMBIA PIPELINE GROUP, INC. SECURITIES LITIGATION | CIVIL ACTION NO. 1:18-cv-03670-GBD |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 2

II. JURISDICTION AND VENUE ..... 8

III. PARTIES AND RELEVANT NON-PARTIES ..... 9

A. Lead Plaintiff ..... 9

B. The Corporate Defendant ..... 9

C. The Executive Officer Defendants ..... 10

D. The Director Defendants ..... 10

E. Relevant Non-Parties ..... 12

IV. FACTUAL BACKGROUND ..... 13

A. Background of NiSource ..... 13

B. The Executive Officer Defendants Seek to Capitalize on Market Interest in the Pre-Spinoff Entities ..... 15

C. The Executive Officer Defendants Engineer a Spinoff of NiSource's Valuable Midstream Business Into a New Independent Company ..... 17

D. The Executive Officer Defendants Assume New Positions at Columbia Pipeline With Transferred and Improved Rights to Golden Parachute Compensation ..... 20

E. Defendants Quickly Engineer a Sale of Columbia Pipeline in Order to Trigger Their Change-in-Control Benefits ..... 22

1. The Executive Officer Defendants Immediately Begin Post-Spinoff Discussions With Potential Bidders ..... 22

2. Columbia Pipeline Enters Non-Disclosure Agreements With Three Additional Bidders ..... 25

3. Spectra Seeks Merger Discussions With Columbia Pipeline ..... 28

4. Columbia Pipeline Purportedly Terminates Merger Discussions to Conduct an Equity Offering ..... 30

5. Without Board Approval, Defendant Smith Re-Engages With TransCanada and Encourages TransCanada to Violate The Standstill Provision ..... 33

6. The Company Enters A Thirty Day Exclusivity Period With TransCanada, Further Disadvantaging Other Bidders ..... 39

7. Columbia Pipeline and TransCanada Extend The Exclusivity Period...... 40

8. Columbia Pipeline Rebuffs An Offer From The Only Bidder Not Bound By A Standstill Provision. ........ 42

9. Columbia Pipeline and TransCanada Enter Into a Third Exclusivity Period and Strike a Deal ........ 46

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT IN THE PROXY ........ 50

A. The Proxy Failed to Disclose That Columbia Pipeline Utilized Standstill Provisions to Eliminate TransCanada's Competition ........ 51

B. The Proxy Omitted That TransCanada Was Provided Due Diligence Materials Without Board Approval ........ 53

C. The Proxy Misrepresented the Ability of Dominion, NextEra and Berkshire to Bid on Columbia Pipeline ........ 55

D. The Proxy Did Not Disclose That Spectra Was on the Verge of Making a Serious Bid to Acquire Columbia Pipeline ........ 58

E. The Proxy Failed to Disclose That Defendants Warned TransCanada of Merger-Related Tax Liability to Preserve its Merger Bid ........ 61

F. Proxy Failed to Disclose That the Executive Officer Defendants Planned the Spinoff and Ultimate Sale of Columbia Pipeline To Quickly Retire With Lucrative Change-In-Control Benefits ........ 63

VI. LOSS CAUSATION ........ 65

VII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 65

VIII. CLASS ACTION ALLEGATIONS ........ 66

IX. CLAIMS ........ 68

COUNT I Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants ........ 68

COUNT II Violation of Section 20(a) of the Exchange Act Against the Executive Officer Defendants and Director Defendants ........ 70

COUNT III Breach of Fiduciary Duty Against the Executive Officer Defendants and Director Defendants (In Their Capacities as Officers and Directors of the Company) ........ 71

X. PRAYER FOR RELIEF ........ 73

XI. JURY DEMAND ........ 74

Court-appointed lead plaintiff The Arbitrage Fund ("Lead Plaintiff"), by and through its attorneys, brings this action on behalf of a class (the "Class") consisting of all shareholders of Columbia Pipeline Group, Inc. ("Columbia Pipeline" or the "Company"), except Defendants (defined below) and their affiliates, (i) who held Columbia Pipeline common stock as of May 18, 2016, the record date ("Record Date") for Columbia Pipeline shareholders to be eligible to vote on the merger ("Merger") between Columbia Pipeline and TransCanada Corporation ("TransCanada"), and (ii) who held Columbia Pipeline common stock through July 1, 2016, the day the Merger closed (the "Effective Date"), and were damaged thereby.

The claims asserted herein are alleged against Columbia Pipeline; Robert C. Skaggs, Jr. ("Skaggs"), Columbia Pipeline's former Chairman and Chief Executive Officer; Stephen P. Smith ("Smith"), Columbia Pipeline's former Chief Financial Officer; Glen L. Kettering, Columbia Pipeline's former President ("Kettering," and together with Skaggs and Smith, the "Executive Officer Defendants"); and the members of Columbia Pipeline's Board of Directors (the "Board") as of the Effective Date, namely: Skaggs, Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, Lester P. Silverman, and Teresa A. Taylor (the "Director Defendants") (collectively, with Columbia Pipeline and the Executive Officer Defendants, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, and for breach of fiduciary duties under Delaware common law.

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on, *inter alia*, the ongoing independent investigation of its undersigned counsel. This investigation includes a review and analysis of: (i) internal Company documents; (ii) the record

in *In re Appraisal of Columbia Pipeline Group, Inc.*, C.A. No. 12736-VCL (Del. Ch.) (the "Appraisal Litigation"); (iii) Columbia Pipeline's filings with the U.S. Securities and Exchange Commission ("SEC"); (iv) testimony of persons who have knowledge of, and/or participated in, the negotiation and consummation of the Merger; (v) transcripts of Columbia Pipeline's conference calls with analysts and investors; (vi) Company presentations, press releases, and reports; (vii) analyst reports about the Company; (viii) news and media reports concerning the Company and other facts related to this action; and (ix) other information and data concerning the Company, as identified herein.

Lead Plaintiff's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control. Lead Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I. INTRODUCTION

1. On July 1, 2015, NiSource, Inc. ("NiSource") spun-off Columbia Pipeline, its then wholly-owned subsidiary, into a stand-alone publicly traded company (the "Spinoff"). Only 8½ months after the Spinoff, on March 17, 2016, Columbia Pipeline announced it had entered into an agreement and plan of merger (the "Merger Agreement") pursuant to which Columbia Pipeline would be acquired by TransCanada, and Columbia Pipeline shareholders would receive $25.50 per share in cash. The transaction was valued at $13 billion, including TransCanada's assumption of Columbia Pipeline debt.

2. The Merger Agreement was approved and recommended to Columbia Pipeline shareholders by the Company's Board. In connection with the Merger, the Board was advised by two investment banks: (i) Goldman, Sachs & Co. and (ii) Lazard Frères & Co. LLC.

3. On April 8, 2016, Columbia Pipeline filed its preliminary proxy statement with the SEC, and filed its definitive proxy statement (the "Proxy") with the SEC on May 17, 2016. On June 22, 2016, Columbia Pipeline's shareholders voted in favor of the Merger.

4. Unbeknownst to Columbia Pipeline shareholders, however, the process that led to the Merger was devised by the Executive Officer Defendants to result in a sale to TransCanada only. Columbia Pipeline did so in part by using "standstill" provisions in non-disclosure agreements with multiple potential bidders to stop the bidding process, and by rushing the TransCanada transaction through before other interested entities were able to submit meaningful competing bids.

5. In particular, immediately after the Spinoff in July 2015, several companies had expressed an interest in acquiring Columbia Pipeline. Defendants entered into non-disclosure agreements with four of these entities, including TransCanada. Each of these non-disclosure agreements contained a standstill provision, which, among other things, precluded merger negotiations absent formal written approval from Columbia Pipeline's Board. The standstill provisions prevented any of these interested entities, including TransCanada, from seeking or offering to acquire the Company, contacting any person relating to matters in the non-disclosure agreements, or making a request to amend or waive the terms of the agreements.

6. Defendants purportedly stopped the bidding process in late 2015 and invoked provisions in the non-disclosure agreement that required the destruction of non-public Company information in order to focus instead on an equity offering to meet the Company's financing requirements. Specifically, on November 25, 2015, the Company advised all active bidders that it was terminating merger discussions and invoking the terms of the non-disclosure agreement in order to prepare for its equity offering. TransCanada and the three other entities subject to the

terms of the non-disclosure agreements were directed to destroy all non-public confidential information regarding Columbia Pipeline, and were prohibited from further engaging in merger negotiations without first receiving written permission from the Company's Board.

7. However, the Executive Officer Defendants thereafter repeatedly and continuously allowed, and even encouraged, TransCanada to violate the standstill provision of its non-disclosure agreement *without* notifying other bidders and *without* allowing them to do the same. This effectively ensured that TransCanada would be the *de facto* sole bidder for Columbia Pipeline, while simultaneously facilitating a quick and essentially uncontested deal that (as further discussed below) the Executive Officer Defendants coveted for their personal financial benefit. Indeed, on December 15, 2015 – in the middle of the equity offering and in violation of the standstill provision in its non-disclosure agreement – TransCanada and the Executive Officer Defendants secretly renewed merger negotiations.

8. Thereafter, on January 7, 2016, representatives of Columbia Pipeline and TransCanada met without prior approval of the Columbia Pipeline Board to facilitate TransCanada's continued due diligence and structuring of a firm bid for the Company. During that meeting, Defendant Smith took the extraordinary step of advising TransCanada that "[*t*]***hey've eliminated the competition***" and identified who those "eliminated" competitors were. (All emphases added unless otherwise indicated). Equally extraordinary, at that January 7 meeting Defendant Smith also gave TransCanada highly confidential due diligence materials on Columbia Pipeline to help it formulate a bid. Two days later, TransCanada and their bankers were granted access to a transaction data room containing additional confidential Company information – all without Board approval and in violation of the standstill provision in its non-disclosure agreement

with Columbia Pipeline. None of the other bidders subject to standstill provisions were granted this opportunity.

9. As a direct result of Defendants' deliberate failure to enforce the standstill provision of the Columbia Pipeline-TransCanada non-disclosure agreement, TransCanada was the only visible bidder during a January 28-29, 2016 executive session of Columbia Pipeline's Board. Given these circumstances, at this executive session, the Board authorized a thirty-day exclusivity period with TransCanada running from February 1, 2016 through March 2, 2016. This exclusivity period was later extended until March 8, 2016.

10. Defendants' plan to ensure the prompt conclusion of a deal with TransCanada would soon come to fruition. On March 4, 2016, Columbia Pipeline's Board voted to waive TransCanada's standstill obligations and invite TransCanada to bid on the Company. Moreover, while the Board concluded it should waive the standstill provisions for three other potential bidders, the Board did not *actually* waive those competitors' standstill provisions until March 12, 2016 – ***only five days*** before the TransCanada Merger Agreement was executed on March 17.

11. On March 11, 2016, three days after the exclusivity period with TransCanada ended, Spectra Energy Corp. – a prospective bidder not subject to a standstill provision – approached Columbia Pipeline to discuss a potential acquisition bid. Nonetheless, Defendant Smith refused to negotiate with Spectra, or use its potential acquisition bid as leverage with TransCanada. Instead, Defendant Smith proceeded to advise TransCanada about the emergence of this new bidder, provided TransCanada with a copy of a scripted Columbia Pipeline message rejecting overtures from Spectra and any other bidders, and agreed to bind Columbia Pipeline to a new exclusivity agreement with TransCanada to prevent Columbia Pipeline's Board from considering any additional bids.

12. Moreover, unbeknownst to Columbia Pipeline shareholders, even before the Spinoff, Defendants helped TransCanada avoid significant tax liability in connection with the Merger, which gave it a material advantage over other potential bidders. Prior to the Spinoff, and on behalf of Defendants, NiSource's financial advisor Lazard Frères & Co. LLC tipped-off TransCanada about the Spinoff and advised that Columbia Pipeline would be "in play" soon after the Spinoff. Lazard further advised TransCanada not to discuss acquiring Columbia Pipeline until after the Spinoff in order to avoid a $3 billion tax penalty that could be assessed against TransCanada and NiSource for any pre-Spinoff merger negotiations. Neither the Company nor its advisors warned any other potential bidders of this tax issue. Thus, Defendants helped preserve TransCanada's ability to bid on Columbia Pipeline after the Spinoff without incurring significant tax liability, while at the same time effectively eliminating other potential bidders by exposing them to the prohibitive tax penalty. None of this was disclosed in the Proxy.

13. Furthermore, unbeknownst to Columbia Pipeline shareholders, prior to the Spinoff, the Executive Officer Defendants had planned to retire soon. This incentivized them to hastily complete a Spinoff followed by a quick merger transaction regardless of whether it maximized shareholder value. Specifically, each had expressed a desire to retire from the Company by no later than July 1, 2016. Pre-Spinoff they had already devised a plan to (i) spinoff NiSource's valuable midstream business into a new independent company (*i.e.*, Columbia Pipeline); (ii) take executive officer positions at the new company; (iii) transfer and increase the value of their change-in-control benefits to the new company; and then (iv) engineer a quick sale of the new company in order to immediately trigger millions in retirement compensation. The Executive Officer Defendants successfully completed their plan and retired from Columbia Pipeline when the Merger closed on July 1, 2016 – the very day they intended to retire all along.

14. By their acts and inaction, Defendants failed to maximize the value of Columbia Pipeline shares in the Merger. The Executive Officer Defendants instead worked to persuade Columbia Pipeline's Board and Columbia Pipeline shareholders to exclude prospective buyers from bidding on the Company, to preference TransCanada over other prospective bidders, and to ultimately accept TransCanada's grossly inadequate $25.50 per share offer.

15. As a result of the Executive Officer Defendants' disloyalty and self-dealing, the representations made to Columbia Pipeline shareholders in the Proxy were materially false and misleading. Specifically, the Proxy sought to portray the bidding process that resulted in the Merger as fairly conducted with all interested bidders on a level playing field. In reality, the decision to sell Columbia Pipeline to TransCanada had been made even before the Spinoff, and all subsequent actions by Defendants were designed to achieve this quick sale to TransCanada.

16. In particular, the statements in the Proxy (identified in ¶¶ 169-212) were materially false and misleading because they failed to disclose that Defendants: (1) negotiated standstill provisions with prospective buyers and then used those provisions to preference TransCanada to the detriment of Columbia Pipeline shareholders and without authorization from the Company's Board; (2) provided TransCanada, but not other bidders, with certain confidential Company information in violation of its standstill provision and without Board approval; (3) conspired to sell the Company to TransCanada by unilaterally offering it exclusivity and eliminating competing bidders; (4) refused to engage in merger negotiations with a bidder that was not bound by a standstill provision and was on the verge of making a serious acquisition bid; (5) warned TransCanada that pre-Spinoff merger negotiations would expose it to significant tax liability, which gave it a significant advantage over other interested bidders; (6) planned the Spinoff and Merger in order to cash in on lucrative change-in-control benefits; and (7) ultimately failed to

negotiate to maximize the value of Columbia Pipeline shares in the Merger through their acts and inaction. As a result of these material misrepresentations and omissions, Columbia Pipeline shareholders were denied the opportunity to make a fully informed decision in voting to approve the Merger and accepting Merger consideration that was well below the fair value of their Columbia Pipeline shares.

17. Accordingly, Lead Plaintiff alleges herein that Defendants (i) violated Sections 14(a) and 20(a) of the Exchange Act by filing materially false and misleading proxy materials, and (ii) breached the fiduciary duties they owed to Lead Plaintiff and the Class.

## II. JURISDICTION AND VENUE

18. Certain of the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over the breach of fiduciary duty claim asserted herein under 28 U.S.C. § 1367.

19. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c) and (d). The dissemination of the Proxy containing materially false and misleading statements and omissions of material fact occurred in this District.

21. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Lead Plaintiff

22. Lead Plaintiff The Arbitrage Fund owned shares of Columbia Pipeline stock eligible to vote on the Merger as of the Record Date, as set forth in the certification attached hereto as Exhibit A, continued to hold Columbia Pipeline shares on the closing date of the Merger, and suffered damages as a result of the violations of the federal securities laws and common law alleged herein. On July 31, 2018, this Court appointed The Arbitrage Fund as Lead Plaintiff for this consolidated class action.

### B. The Corporate Defendant

23. Defendant Columbia Pipeline is a Delaware corporation headquartered in Houston, Texas with its principal executive offices located at 5151 San Felipe Street, Suite 2500, Houston, Texas 77056. Columbia Pipeline was established on September 26, 2014 as a subsidiary of NiSource. NiSource then spun off Columbia Pipeline as a new independent, publicly-traded company on July 1, 2015, with NiSource stockholders receiving one share of Columbia Pipeline common stock for each share of NiSource stock they held prior to the Spinoff. Columbia Pipeline was acquired by TransCanada in the Merger and is now a wholly-owned subsidiary of TransCanada. Until the consummation of the Merger and delisting of the Company's common stock from the NYSE, the Company's common stock was listed and actively traded on the NYSE under the ticker symbol "CPGX."

**C. The Executive Officer Defendants**

24. Defendant Skaggs first joined NiSource in 1981 as an attorney for its subsidiary Columbia Gas Transmission Corporation. He served as President and Chief Executive Officer of NiSource from October 26, 2004 to June 2, 2015, and from July 1, 2005 to June 2, 2015, respectively. Following the Spinoff, Skaggs left NiSource to become Chairman of the Board and CEO of Columbia Pipeline, positions in which he served at the time of the Merger and Effective Date. Skaggs signed the Proxy that included false and misleading statements of material fact and/or omitted material facts necessary to make statements in the filing not misleading. In addition, as a member of the Board, Skaggs issued the Proxy.

25. Defendant Smith first joined NiSource in 1996 as CFO for its subsidiary Columbia Gas Transmission Corporation. Until the Spinoff, Smith served as Executive Vice President and CFO of NiSource from June 2008 to June 2015. Following the Spinoff, Smith left NiSource to become CFO of Columbia Pipeline, a position in which he served at the time of the Merger and Effective Date.

26. Defendant Kettering first joined NiSource's subsidiary Columbia Gas Transmission Corporation in 1979 as an attorney. Kettering served as Executive Vice President of NiSource from April 2014 until the Spinoff. Following the Spinoff, Kettering left NiSource to become President of Columbia Pipeline, a position in which he served at the time of the Merger and Effective Date.

27. Defendants Skaggs, Smith, and Kettering are collectively referred to as the "Executive Officer Defendants."

**D. The Director Defendants**

28. Defendant Sigmund L. Cornelius served as a director of NiSource from 2011 until the Spinoff, at which time he became a Director of Columbia Pipeline. Cornelius served as Lead

Director of the Columbia Pipeline Board at the time of the Merger and Effective Date. Defendant Cornelius issued the Proxy as a member of the Columbia Pipeline Board. The Proxy stated that it was issued "by order of the Board of Directors" of Columbia Pipeline and "as part of the solicitation of proxies by the Board" of Columbia Pipeline.

29. Defendant Marty R. Kittrell served as a director of NiSource from 2007 until the Spinoff, at which time he became a Director of Columbia Pipeline. Kittrell was a member of the Columbia Pipeline Board at the time the Proxy was issued and as of the Effective Date of the Merger. Defendant Kittrell issued the Proxy as a member of the Columbia Pipeline Board.

30. Defendant W. Lee Nutter served as a director of NiSource from 2007 until the Spinoff, at which time he became a Director of Columbia Pipeline. Nutter was a member of the Columbia Pipeline Board at the time the Proxy was issued and as of the Effective Date of the Merger. Defendant Nutter issued the Proxy as a member of the Columbia Pipeline Board.

31. Defendant Deborah S. Parker served as a director of NiSource from 2007 until the Spinoff, at which time she became a Director of Columbia Pipeline. Parker was a member of the Columbia Pipeline Board at the time the Proxy was issued and as of the Effective Date of the Merger. Defendant Parker issued the Proxy as a member of the Columbia Pipeline Board.

32. Defendant Lester P. Silverman became a Director of Columbia Pipeline in 2015. Silverman was a member of the Board at the time the Proxy was issued and as of the Effective Date of the Merger. Defendant Silverman issued the Proxy as a member of the Columbia Pipeline Board.

33. Defendant Teresa A. Taylor served as a director of NiSource from 2012 until the Spinoff, at which time she became a Director of Columbia Pipeline. Taylor was a member of the

Board at the time the Proxy was issued and as of the Effective Date of the Merger. Defendant Taylor issued the Proxy as a member of the Columbia Pipeline Board.

34. Defendants Skaggs, Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, Lester P. Silverman, and Teresa A. Taylor are collectively referred to herein as the "Director Defendants."

35. Columbia Pipeline, the Executive Officer Defendants, and the Director Defendants are collectively referred to hereinafter as "Defendants."

**E. Relevant Non-Parties**

36. Goldman Sachs & Co. ("Goldman Sachs") served as one of Columbia Pipelines' financial advisors in connection with the Merger. Goldman Sachs and its affiliates are engaged in advisory services, underwriting and financing, principal investing, sales and trading, investment management and other financial and non-financial activities and services for various persons and entities.

37. Lazard Frères & Co. LLC ("Lazard") served as one of Columbia Pipelines' financial advisors in connection with the Merger. Lazard and its affiliates focus on providing financial advisory and asset management services to its clients. The financial advisory business counsels clients globally on strategic and financial matters including mergers and acquisitions, restructurings, capital structure and capital raising. The asset management business oversees investment portfolios in key regions of the world and distributes them locally, regionally and globally.

38. Spectra Energy Corp. ("Spectra") was an oil and gas pipeline company headquartered in Houston, Texas. Spectra was engaged in natural gas transmission, storage, and processing. Spectra owned the Texas Eastern Pipeline, which transmits gas from the Gulf of

Mexico to the Northeast. In February 2017, Spectra merged into the Canadian company Enbridge Inc. The Proxy referred to Spectra as "Party A."

39. Dominion Resources, Inc. ("Dominion") is a fully integrated gas and electric holding company headquartered in Richmond, Virginia. Dominion focuses on gas and electric transmission from the Midwest to its primary Mid-Atlantic service areas in Ohio, Pennsylvania, West Virginia, Virginia, North Carolina, New York and New England. The Proxy referred to Dominion as "Party B."

40. NextEra Energy, Inc. ("NextEra") is an energy company headquartered in Juno Beach, Florida. Through its subsidiaries, NextEra generates emissions-free electricity from eight commercial nuclear power units in Florida, New Hampshire, Iowa and Wisconsin. The Proxy referred to NextEra as "Party C."

41. Berkshire Hathaway Energy Company ("Berkshire") is a holding company that owns a highly diversified portfolio of locally managed businesses principally engaged in the energy industry. Berkshire is a consolidated subsidiary of Berkshire Hathaway Inc. One of Berkshire's businesses is MidAmerican Funding, LLC which primarily consists of MidAmerican Energy Company. The Proxy referred to Berkshire as "Party D."

## IV. FACTUAL BACKGROUND

### A. Background of NiSource

42. NiSource is an energy company headquartered in Merrillville, Indiana. NiSource operated two distinct businesses prior to the Spinoff: (i) a regulated utility business that distributed natural gas and electricity throughout seven states; and (ii) a midstream natural gas business with pipeline and storage assets. NiSource's midstream natural gas business was comprised of Columbia Gas Transmission, Columbia Gulf Transmission, Columbia Midstream Group,

Columbia Pipeline Partners, and other natural gas pipeline, storage, and midstream entities owned by NiSource (the "Pre-Spinoff Entities").

43. Prior to the Spinoff, NiSource management projected its utility business was positioned to generate stable 4%–6% earnings and dividend growth. However, NiSource and the investment community considered the assets of the Pre-Spinoff Entities to be the most valuable assets held by NiSource.

44. The Pre-Spinoff Entities included a network of pipeline and storage assets in the robust natural gas producing Marcellus and Utica shale regions. A pipeline company's most important asset is the physical footprint of its pipes given the difficulty in obtaining continuous "right-of-way" grants (property easements) across geographic locations.

45. NiSource had a long-standing, but not very profitable pipeline network in the Marcellus and Utica shale basins when, in the mid-2000's, the technology to extract gas from shale developed and pipelines in those regions became valuable resources. NiSource's Pre-Spinoff Entities were considered valuable because they connected these natural gas sources to fast growing end markets, including on the U.S. Gulf Coast.

46. The Pre-Spinoff Entities were generating positive cash flows as of 2014. Approximately 95% of their revenues were coming from long-term contracts that had an average remaining term of five years. This stability protected the Pre-Spinoff Entities from exposure to commodity price fluctuations. The Pre-Spinoff Entities were also engaged in a capital expansion program that ensured further growth. This included projected growth at a compounded annual rate of 20% through 2020 and a 15% dividend growth over that same period.

**B. The Executive Officer Defendants Seek to Capitalize on Market Interest in the Pre-Spinoff Entities**

47. NiSource's Pre-Spinoff Entities attracted significant interest from potential buyers in 2014. However, these indications of interest raised a significant issue for the Executive Officer Defendants who were executives of NiSource at the time. Defendant Skaggs was the NiSource President and CEO, Defendant Smith was a NiSource Executive VP and the CFO, and Defendant Kettering was a NiSource Executive VP and the head of NiSource's midstream business.

48. The Executive Officer Defendants were nearing retirement after working at NiSource for decades. Each would receive substantial golden parachute retirement payments in the event of a change-in-control transaction. Specifically, in the event they retired as a result of a change-in-control transaction, each Executive Officer Defendant would be entitled to: (i) a lump sum payment at a multiple (three times for Skaggs, and two times for Smith and Kettering) of their current base salary and target bonus; (ii) a *pro rata* portion of their target bonus for the year of termination; (iii) immediate vesting of previously granted stock awards and restricted stock units; and (iv) certain valuable health insurance benefits. These benefits were set forth in the Executive Officer Defendants' respective employment agreements.

49. Thus, a retirement caused by a change-in-control transaction would have resulted in each Executive Officer Defendant receiving enormous payments in excess of what they would have otherwise received. Specifically, Defendants Skaggs, Smith and Kettering would have received $17.9 million, $7.5 million, and $6.1 million more in change-in-control benefits, respectively. Collectively, they would be paid ***$31.5 million*** more than if they retired voluntarily instead of due to a change-in-control transaction.

50. However, the indications of interest received in 2014 did not contemplate a whole-company acquisition of NiSource, *i.e.*, they did not qualify as "change-in-control" transactions. In

order for an asset sale to qualify as a change-in-control transaction under the Executives' employment agreements, the sale would need to encompass "50% of the aggregate book value of NiSource Inc. and its Affiliates and Associates as set forth on the most recent balance sheet of NiSource Inc., prepared on a consolidated basis."

51. The Pre-Spinoff Entities made up only 24%-25% of NiSource's total book value as of the end of 2014. Therefore, a sale of those assets would not trigger the lucrative change-in-control benefits for the Executive Officer Defendants. Additionally, should the Executive Officer Defendants remain at NiSource after a sale of the Pre-Spinoff Entities, they would oversee a company with less overall value and little potential of entering into a change-in-control transaction that could trigger their lucrative retirement benefits.

52. In response to this problem, the Executive Officer Defendants devised a plan to: (i) spinoff NiSource's valuable Pre-Spinoff Entities into a new independent company (*i.e.*, Columbia Pipeline); (ii) take executive officer positions at Columbia Pipeline; (iii) transfer the value of their change-in-control benefits to Columbia Pipeline (and increase those benefits still further); and then (iv) quickly sell Columbia Pipeline in order to trigger their tens of millions of dollars' worth of reconstituted change-in-control benefits.

53. The Executive Officer Defendants explicitly connected the Spinoff with their retirement plans. On December 3, 2014, Matthew Gibson, who was the Goldman Sachs team leader working with NiSource, reported to his colleagues that he had met with Defendant Smith. Smith sought Goldman Sachs' valuation of the Pre-Spinoff Entities. Gibson reported that Defendants Skaggs and Smith were going to work for Columbia Pipeline after the Spinoff in part because "they don't want to work forever." He also wrote that Skaggs and Smith "love the business and [they] think they see [an opportunity] for a sale in the near term."

54. Additionally, a Goldman Sachs affiliate, AYCO, was contracted by NiSource to provide financial planning services to key executives. AYCO representative Rick Rivera confirmed Defendant Smith and Skaggs' retirement timeline. On February 23, 2015, Rivera wrote Defendant Smith a letter confirming that Smith had "put the new target [for his retirement] as early as June of 2016." In addition, Rivera wrote a memorandum to file entitled "June 1, 2015, meeting memo" stating that Defendant Skaggs had "noted that [Columbia Pipeline] could be purchased as early as Q3, 4 of 2015," and that Rivera thought "they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016."

### C. The Executive Officer Defendants Engineer a Spinoff of NiSource's Valuable Midstream Business Into a New Independent Company

55. On September 26, 2014, the Executive Officer Defendants caused NiSource to establish a new wholly-owned subsidiary, Columbia Pipeline. The newly organized Columbia Pipeline now held NiSource's valuable midstream assets (*i.e.*, the Pre-Spinoff Entities).

56. The Executive Officer Defendants then started working on a post-Spinoff sale of Columbia Pipeline. However, they knew that U.S. tax law imposed another potential challenge to their planned sale of the Company. Under U.S. tax law, a tax-optimization strategy known as the "Reverse Morris Trust" permits a company to effectuate a tax-free sale of a subsidiary through a spinoff and subsequent sale of the new company. But Reverse Morris Trust rules impose significant tax liabilities which essentially prohibit pre-spinoff suitors from acquiring a post-spinoff company for a period of two years after the spinoff. Specifically, during this two-year presumptive period any acquisition of the spun-off entity will be treated as a "plan or series of related transactions" that was designed to result in the sale of that entity. Both the pre-spinoff

parent of the subsidiary and the acquirer risk incurring onerous tax liabilities if they cannot establish that the post spin-off acquisition was *not* part of a "plan or series of related transactions."

57. Thus, any entity that had a merger discussion with NiSource within the two-year period prior to the Spinoff and which then merged with the spun-off NiSource subsidiary (*i.e.*, Columbia Pipeline) within two years of the Spinoff would incur tax liability. Accordingly, any company that had submitted an indication of interest for NiSource's midstream business would not be able to bid for Columbia Pipeline for a period of two years after the planned Spinoff without incurring a prohibitive tax penalty estimated to be approximately $3 billion. Because the Spinoff occurred on July 1, 2015, these entities could not safely submit a bid to acquire the post-Spinoff Columbia Pipeline until July 1, 2017 (two years after the Spinoff).

58. TransCanada understood the implications of these tax issues. For example, Peter Ewing, TransCanada's Director of Corporate Development, sent an email to Francis Poirier regarding Columbia Pipeline's "Tax Exposure In Layman's Terms," confirming that TransCanada's interpretation of the Reverse Morris Trust requirements were in line with the above.

59. The Executive Officer Defendants utilized this potential tax penalty to their advantage by engineering a sale of Columbia Pipeline to their preferred bidder, TransCanada. They did so by warning TransCanada about the Reverse Morris Trust risk without doing so for other potential bidders. This preserved TransCanada's ability to bid on Columbia Pipeline after the Spinoff and gave TransCanada time to construct its Merger proposal, while at the same time effectively eliminating other post-Spinoff bidders by exposing them to the prohibitive tax penalty. As a result, this decreased the number of competitive bidders to drive up the merger price for Columbia Pipeline.

60. Defendants tipped-off TransCanada about the Reverse Morris Trust risk prior to the Spinoff through NiSource's long-time investment banking firm Lazard. Lazard approached TransCanada and discussed its potential interest in acquiring Columbia Pipeline post-Spinoff. Specifically, on May 28, 2015, Frank Setian, a senior advisor at Lazard, conveyed to Mark Zimmerman at TransCanada that NiSource was planning a spinoff that would take effect on July 1, 2015, that there were significant Reverse Morris Trust issues, and that the Company "may be put into play shortly after."

61. Mark Zimmerman from TransCanada also documented in a June 30, 2015 email that Lazard had previously warned TransCanada about the Reverse Morris Trust concerns. His email indicated that on behalf of NiSource, Lazard "advised [TransCanada about] not opening a dialogue until the separation was complete."

62. TransCanada's internal emails also reveal that they believed the Reverse Morris Trust tax liability prevented other bidders from buying Columbia Pipeline after the Spinoff. One of those bidding companies was Enbridge, Inc., a multinational Canadian energy company. According to TransCanada, "Enbridge may have had prior discussions with NiSource that could impact the tax-free status of the spin of Columbia." Thus, TransCanada understood that other competing Columbia Pipeline bidders were at risk of the tax liabilities imposed by the Reverse Morris Trust issues.

63. On July 1, 2015, NiSource completed the Spinoff, separating the Pre-Spinoff Entities into the stand-alone publicly traded Columbia Pipeline. NiSource stockholders received one share of Columbia Pipeline stock for each share of NiSource stock they held at the time of the Spinoff. Columbia Pipeline was a highly focused, pure-lay pipeline, midstream and storage company with strategically located infrastructure linking the Marcellus and Utica supply regions

to the Midwest, Mid-Atlantic, and Gulf Coast markets. It owned and operated more than 15,000 miles of interstate pipelines from New York to the Gulf of Mexico.

### D. The Executive Officer Defendants Assume New Positions at Columbia Pipeline With Transferred and Improved Rights to Golden Parachute Compensation

64. The Executive Officer Defendants moved forward with their plan by becoming executive officers at Columbia Pipeline after the Spinoff. Defendant Skaggs became Columbia Pipeline's CEO and Chairman of the Board. Defendant Smith became Columbia Pipeline's Executive Vice President and CFO. Defendant Kettering became Columbia Pipeline's President.

65. Five members of NiSource's Board—Defendants Cornelius, Kittrell, Nutter, Parker, and Taylor—also left NiSource to become directors at Columbia Pipeline. These directors and Skaggs constituted six of NiSource's 11-member board that approved the Spinoff. All six then became members of Columbia Pipeline's seven-member Board. The seventh Columbia Pipeline director was Defendant Silverman.

66. The Executive Officer Defendants also secured transfers of their change-in-control benefits when they moved to Columbia Pipeline. Going forward, a sale of Columbia Pipeline would therefore trigger payment of the Executive Officer Defendants' change-in-control benefits. The Executive Officer Defendants would not have otherwise received these benefits had they retired directly from NiSource.

67. The Executive Officer Defendants also acted to enrich themselves further by *increasing* the value of the change-in-control benefits they would receive upon a sale of Columbia Pipeline. They did so even though the size of the newly created Columbia Pipeline was *smaller* than NiSource, the company they were leaving.

68. Prior to the Spinoff, Defendant Skaggs actively campaigned for this increase in the Executive Officer Defendants' change-in-control benefits. On May 12, 2015, a meeting of the

"Columbia Pipeline Group Human Resources and Compensation Committee" was held. This committee had been formed prior to the Spinoff in order to help facilitate a seamless transition. The meeting agenda noted that Defendant Skaggs argued he should receive the same salary, target bonus, and long-term incentive as he was currently receiving at NiSource. But Skaggs also asserted that each senior executive of the newly formed Columbia Pipeline should receive a "founder's grant." Specifically, Defendant Skaggs proposed $750,000 each for Defendants Smith and Kettering and left a blank next to his own name to avoid being "presumptive."

69. Defendant Skaggs also proposed that Defendants Kettering and Smith should receive ***three*** times (instead of twice) their current annual base salary and target incentive bonus compensation for three years after the Spinoff. These benefits would revert to their then-current amounts after the three-year period. NiSource granted Defendant Skaggs' request and increased all of the Executive Officer Defendants' change-in-control benefits accordingly for the three-year period. This change only furthered their incentive to quickly sell the post-Spinoff Columbia Pipeline.

70. In addition, Defendant Skaggs maneuvered to ensure that the Executive Officer Defendants obtained new positions at Columbia Pipeline which would entitle them to the lucrative change-in-control benefits. The NiSource board of directors had considered appointing either Defendant Smith or Kettering to replace Skaggs as CEO of NiSource following the Spinoff. However, according to his deposition in the Appraisal Litigation, Defendant Skaggs successfully campaigned for another CEO candidate. This left Defendants Smith and Kettering eligible for positions at the new Company and secured their enhanced change-in-control benefits once Columbia Pipeline was sold.

71. The five non-executive Director Defendants who left NiSource for Columbia Pipeline had also accumulated substantial amounts of restricted stock units that would immediately vest upon a change-in-control at NiSource. Like Defendants Skaggs, Smith, and Kettering, the Director Defendants' also acted to ensure their change-in-control benefits were transferred with them when they moved from NiSource to Columbia Pipeline.

72. By the time NiSource completed the July 1, 2015 Spinoff, the Executive Officer Defendants and Director Defendants were ready to collect their golden parachute change-in-control compensation by orchestrating a sale of Columbia Pipeline at the earliest practicable moment.

## E. Defendants Quickly Engineer a Sale of Columbia Pipeline in Order to Trigger Their Change-in-Control Benefits

### 1. The Executive Officer Defendants Immediately Begin Post-Spinoff Discussions With Potential Bidders

73. At the time of the Spinoff, Defendants touted Columbia Pipeline as a long-term investment for "investors seeking earnings and dividend growth in line with a pure-play natural gas pipeline, midstream and storage business." Defendant Skaggs touted to the market that Columbia Pipeline's new independent status would promote its ability to "execute on [its] robust, long-term investment plans," including a "potential capital investment opportunity of $12–$15 billion over the next 10 years, positioning the company to provide enhanced earnings and dividend growth driven by its projected net investment growth."

74. In reality, the Executive Officer Defendants were not focused on Columbia Pipeline's long-term prospects as an independent company. Instead, they were intent from day one on selling Columbia Pipeline in order to trigger, and cash-in on, their lucrative change-in-control compensation. The Proxy omitted any discussion of the real reason Defendants were pursuing a sale immediately after the Spinoff.

75. Defendant Skaggs was so confident about his imminent retirement that he had already bought his retirement house in South Carolina, and sold his home in Chicago located near the headquarters of NiSource. Instead of moving to Houston, Texas, where Columbia Pipeline was headquartered after the Spinoff, he rented an apartment in Columbus, Ohio and bought a house in South Carolina, where he planned to retire. Defendant Skaggs never intended to move to Houston and viewed his stay in Ohio as temporary. He knew all along that he would be retiring to South Carolina shortly. Defendant Smith also temporarily relocated to Columbus, Ohio instead of moving to Houston where Columbia Pipeline was now headquartered.

76. Defendants had also taken early steps to orchestrate a Columbia Pipeline merger after the Spinoff. NiSource had previously engaged Lazard to promote a sale of Columbia Pipeline's assets in September 2014, well before the July 1, 2015 Spinoff. NiSource also retained Goldman Sachs to assist with a sale in an engagement letter dated March 19, 2015. Goldman was later retained by Columbia Pipeline in an engagement letter dated July 2, 2015—the first day after the Spinoff. This second engagement letter indicated that Goldman Sachs was assisting Columbia Pipeline with, "among other things, preparing for unsolicited acquisition proposals."

77. Within a week of the Spinoff, the Executive Officer Defendants began entertaining suitors interested in acquiring Columbia Pipeline.

**a. <u>Spectra</u>**

78. On July 7, 2015, only four days after the Spinoff, the CEO of Spectra Energy Corp. ("Spectra"), a large U.S. midstream energy company, had a telephone conversation with Defendant Skaggs in which Spectra's CEO conveyed an interest in a strategic transaction with Columbia Pipeline. Spectra is referred to as Party A in the Proxy. Spectra's CEO would initiate further merger discussions with Defendant Skaggs in 2015. However, Defendant Skaggs would

continuously rebuff their indications of interest in a transaction. As Defendant Skaggs testified at the Appraisal Litigation, he saw Spectra as a "frivolous party" with "no currency" and "no balance sheet," despite recognizing their $20 billion market cap.

**b. <u>Dominion</u>**

79. Later in July 2015—still within mere weeks of the Spinoff—the CEO of Dominion Resources, Inc. ("Dominion"), a large U.S. diversified utility company referred to in the Proxy as Party B, contacted Defendant Skaggs about exploring potential strategic opportunities for the two companies. Defendant Skaggs identified Dominion as a "notable/substantive" bidder in an email to Defendant Cornelius on July 14, 2015.

80. On July 20, 2015, Dominion's CEO made a verbal indication of interest in acquiring Columbia Pipeline at a price of $32.50 to $35.50 per share of Columbia Pipeline common stock. In response, Defendant Skaggs contacted Dominion's CEO to convey that Dominion would need to move to a price per share in the "upper-$30s" before Columbia Pipeline would be willing to seriously engage with Dominion.

81. Nevertheless, the Board viewed Dominion as a serious bidder. On August 12, 2015, Columbia Pipeline and Dominion entered into a mutual non-disclosure agreement and Dominion began performing due diligence on Columbia Pipeline. The non-disclosure agreement with Dominion included a "standstill" provision. The standstill provision provided that for a period of eighteen months after signing the agreement, Dominion could not offer to acquire equity securities or material assets of Columbia Pipeline unless the Columbia Pipeline Board specifically requested this in writing in advance. Columbia Pipeline stipulated in the Appraisal Litigation that the standstill provision in the Dominion non-disclosure agreement contained "functionally

identical language" to the standstill provision the Company later entered into with TransCanada (discussed in Section 2.a below).

82. Soon after entering the non-disclosure agreement with Dominion, the negotiations were short-circuited by general stock market volatility in the energy sector and a corresponding decline in Columbia Pipeline's stock price.

**2. Columbia Pipeline Enters Non-Disclosure Agreements With Three Additional Bidders**

**a. <u>TransCanada</u>**

83. On October 9, 2015, just over three months after the Spinoff, TransCanada continued its earlier efforts to acquire Columbia Pipeline. This effort was spearheaded by Defendant Smith and TransCanada's SVP for Strategy and Corporate Development, Francis Poirier ("Poirier"). Smith had a prior relationship with Poirier, who had acted as J.P. Morgan's relationship manager for American Electric Power Co. when Smith served as Treasurer of that company.

84. In early October 2015, Mr. Poirier asked Eric Fornell at Wells Fargo Securities if he thought Columbia Pipeline would be open to a discussion to explore a commercial relationship. Mr. Fornell offered to reach out to Defendant Smith to ask if he would be open to a conversation about a potential transaction with TransCanada. Smith stated that he was willing to do so.

85. On October 9, 2015, Mr. Poirier called Defendant Smith to request a dinner meeting for later that month. Smith and Poirier met for dinner on October 26, 2015. At the dinner, Poirier advised Smith that TransCanada was interested in a potential acquisition to acquire Columbia Pipeline. On November 9, 2015, TransCanada and Columbia Pipeline signed a mutual non-disclosure agreement, similar to the agreement with Dominion.

86. The TransCanada non-disclosure agreement included a standstill provision that read as follows:

> "Standstill. In consideration for being furnished with Evaluation Material by the other Party, each Party (each such Party in such context, the "Standstill Party") agrees that until the date that is twelve months after the date of this Agreement, unless the other Party's board of directors otherwise so specifically requests in writing in advance, the Standstill Party shall not:
>
> (A) acquire or offer to acquire, or seek, propose or agree to acquire, by means of a purchase, tender or exchange offer, business combination or in any other manner, beneficial ownership . . . of the other Party
>
> (B) seek or propose to influence, advise, change or control the management, board of directors, governing instruments or policies or affairs of the other Party, including by means of a solicitation of proxies . . . including any otherwise exempt solicitation pursuant to Rule 14a-2(b) under the Exchange Act, ***contacting any person relating to any of the matters set forth in this Agreement*** or seeking to influence, advise or direct the vote of any holder of voting securities of the other Party ***or making a request to amend or waive this provision or any other provision of this Section 3*** or
>
> (C) make any public disclosure, or take any action that could require the other Party to make any public disclosure, with respect to any of the matters that are the subject of this Agreement." (the "TransCanada Standstill Provision").

87. In an internal email to Mr. Poirier on December 1, 2015, Christine R. Johnston, TransCanada's Vice President of Law and Corporate Secretary, summarized the TransCanada Standstill Provision to mean that:

> "for 12 months from November 9, 2015, TransCanada and its directors, officers and representatives cannot, unless [Columbia Pipeline]'s board specifically requests in writing in advance:
>
> 1) Acquire, offer or agree to acquire ownership of equity securities or material assets
>
> 2) Seek to influence, advise, change or control its management or the board (including by solicitation of proxies), or request amendment to the standstill provisions
>
> 3) Make any public disclosure or take actions that require [Columbia Pipeline] to make public disclosure with respect to matters that are the subject of this agreement."

88. Later that day, Mr. Poirier forwarded the email from Ms. Johnston to Russell Girling, the CEO of TransCanada. In the email, Mr. Poirier interpreted Ms. Johnston's message to mean that TransCanada "basically must get [Columbia Pipeline]'s acquiescence to pursue this transaction, or even to seek to influence them. Under item 2, this extends to reaching out to board members without Bob [Skaggs]' knowledge or consent . . . I think this restricts our alternatives to you going through Bob." Thus, the most senior TransCanada officials believed that all communications about a potential transaction must go through Defendant Skaggs to be in compliance with the TransCanada Standstill Provision.

**b. <u>Dominion/NextEra</u>**

89. Other bidders engaged in merger discussions with Columbia Pipeline in the fourth quarter of 2015. On October 26, 2015, Defendant Skaggs sent an email to Defendant Cornelius to update him on a discussion he had with Dominion, which had already expressed an interest in acquiring the Company. Skaggs wrote, "My conversation today with Dominion's CEO, Tom Farrell, was straightforward and constructive. He wants to digest my messages and confer with his Board on Wednesday (during a previously scheduled telephonic Board Meeting). He will then call me on Thursday. I'm expecting a response that would be in the 20-25% premium zip code ($24-$25)."

90. On October 29, 2015, the Columbia Pipeline Board had a telephonic meeting, during which the Board determined that Dominion would likely have a greater ability *to pay a higher price compared to TransCanada* based on Columbia Pipeline's then-recent stock price performance and balance sheet considerations.

91. On November 2, 2015, Defendant Skaggs met with Dominion's CEO, who proposed two potential approaches: (i) a joint acquisition of Columbia Pipeline by Dominion and NextEra Energy, Inc. ("NextEra" or "Party C"), in an all-stock, modified "merger of equals"

transaction with a modest premium, or (ii) an equity investment by Dominion in certain Columbia Pipeline subsidiaries or joint ventures. In response, Columbia Pipeline agreed to seek additional information on the proposed joint acquisition by Dominion and NextEra.

92. On November 12, 2015, the Company entered into a mutual non-disclosure agreement with NextEra, which allowed for the sharing of certain information with Dominion. This non-disclosure agreement also contained a standstill provision, which Columbia Pipeline has stipulated in the Appraisal Litigation contained "functionally identical language" to the TransCanada Standstill Provision.

#### c. Berkshire Hathaway

93. On November 11, 2015, Goldman Sachs contacted a representative of Berkshire Hathaway Energy Company ("Berkshire" or "Party D") to explore Berkshire's interest in Columbia Pipeline. On November 17, 2015, Berkshire and Columbia Pipeline entered into a mutual non-disclosure agreement with a standstill provision. Columbia Pipeline has stipulated in the Appraisal Litigation that this standstill provision contained "functionally identical language" to the TransCanada Standstill Provision.

94. Despite the existence of the credible "inbound" bidders Dominion/NextEra, Spectra and Berkshire, TransCanada still received preferential treatment. On November 13, 2015, Defendants Smith and Kettering met with TransCanada's Mr. Poirier, Alexander J. Pourbaix, Chief Operating Officer of TransCanada, and Karl Johannson, Executive Vice-President and President of Natural Gas Pipelines of TransCanada to discuss a potential acquisition of Columbia Pipeline by TransCanada.

### 3. Spectra Seeks Merger Discussions With Columbia Pipeline

95. On November 3, 2015, Spectra's CEO, Greg Ebel, emailed Defendant Skaggs to re-initiate discussions about a strategic transaction. Spectra was not bound by a standstill provision

at this or any other time. Mr. Ebel wrote to Defendants Skaggs, in part, "I would like to get together in the next couple of weeks to discuss what we may be able to accomplish together." Defendant Skaggs never responded to this email, and the Proxy omitted any reference of this outreach by Spectra.

96. On November 9, 2015, Defendant Skaggs had a telephone call with Spectra's CEO, during which Skaggs indicated that Columbia Pipeline was going to proceed with an equity financing in the near term. Defendant Skaggs testified in the Appraisal Litigation that on this call he never informed Spectra's CEO that Columbia Pipeline's Board wanted to receive acquisition bids before a planned November 25th Board meeting. In contrast, Defendant Skaggs had informed TransCanada and Berkshire of the Board's November 24 deadline to make acquisition bids (*see infra* Section IV.E.4). Defendant Skaggs clearly intended to discourage Spectra's CEO from making a bid on Columbia Pipeline and sought to rebuff Spectra's indications of interest.

97. On November 15, 2015, Defendant Skaggs provided the Board with a memorandum titled "CPG's Equity Game Plan: Update and Path Forward." In that memorandum, Skaggs informed the Board that "[a]lthough [Spectra's] CEO has again registered interest in [Columbia Pipeline], Spectra (... $20 billion market cap) . . . hasn't followed-up with a request for a meeting or an initial substantive discussion." The Proxy noted that Defendant Skaggs reiterated Spectra's purported lack of interest at a Board meeting on November 17, 2015. However, the Proxy omitted that, in fact, Spectra's CEO emailed Defendant Skaggs on November 3 to express his clear interest in a transaction, and requested a meeting with Skaggs to discuss further. Skaggs and the other Defendants failed to engage with Spectra.

### 4. Columbia Pipeline Purportedly Terminates Merger Discussions to Conduct an Equity Offering

98. On November 17, 2015, the Columbia Pipeline Board decided to focus on an equity offering instead of a sale. The Board indicated a concern about the volatility in capital markets and the possibility of missing an optimal window to do an equity financing if it was delayed past early December.

99. Nonetheless, on November 19, 2015, Defendant Skaggs advised Berkshire and TransCanada to make offers by a deadline date of November 24. Defendant Skaggs did not inform Dominion, NextEra or Spectra of this November 24 deadline to make bids, and the Proxy provides no explanation for why these entities were not so advised.

100. TransCanada and Berkshire each made verbal indications of interest to Defendant Skaggs on November 24, 2015. Berkshire indicated that it was interested in acquiring Columbia Pipeline at $23.50 per share of Columbia Pipeline common stock. TransCanada indicated it was interested in pursuing an all-cash acquisition at a price per Columbia Pipeline share in the range of $25 to $26. At the meeting where TransCanada offered that bid range, Mr. Girling, the CEO of TransCanada told Skaggs that TransCanada was "not inclined to participate in an auction process" with other bidders.

101. In an email dated November 25, 2015, Keith Conley of TransCanada informed his colleague Catherine Davis that Defendant Skaggs had indicated to TransCanada's CEO that he would talk to the Columbia Pipeline Board about entering an exclusivity agreement with TransCanada. Defendant Skaggs indicated that he would raise the exclusivity agreement with TransCanada at the Columbia Pipeline Board meeting that day. This communication regarding a TransCanada exclusivity agreement was not disclosed in the Proxy.

102. At the November 25 meeting, Defendant Skaggs informed the Board of the potential offers for Columbia Pipeline. However, the Board decided to terminate the sales process and proceed with the equity offering. Later that same day, the Company advised Dominion, NextEra, Berkshire and TransCanada that it was terminating merger discussions and invoking the terms of the non-disclosure agreements. All four companies were instructed to destroy all non-public information they had about Columbia Pipeline. Under the standstill provisions in their respective non-disclosure agreements, these companies could not try to acquire Columbia Pipeline, or even request an amendment to the standstill provision, without first receiving written permission from the Columbia Pipeline Board.

103. Dominion and NextEra were clearly interested in making a bid for Columbia Pipeline at this time. As soon as NextEra received the "pencils down" notice, they informed Columbia's General Counsel, "[t]his was news to us—we were working it." Indeed, as noted above, Columbia Pipeline's Board had determined earlier that Dominion would likely have a greater ability to pay a higher price than TransCanada.

104. According to an internal Wells Fargo email (which was advising TransCanada on the transaction), Defendant Skaggs called Russell Girling, the CEO of TransCanada, later on November 25, to advise him that the Company was terminating merger discussions and invoking the terms of the non-disclosure agreements.

105. In response, TransCanada asked if they could try to close the gap between their current offer of $26 and Columbia Pipeline's asking price of $28 to get a deal done before Christmas. Defendant Skaggs discussed that possibility with Defendant Kettering, but ultimately indicated that Columbia Pipeline was unwilling to take the risk of missing its window for the contemplated equity offering.

106. Nonetheless, in a telephone conversation on November 25, 2015, Defendant Smith indicated to TransCanada's Poirier that Columbia Pipeline would want to pick up the merger discussion with TransCanada again "in a few months." By contrast, neither Smith nor anyone at else at Columbia Pipeline conveyed a similar message to Spectra or any of the potential bidders who were blocked by standstill provisions, *i.e.*, Dominion, NextEra, and Berkshire. Nor was Defendant Smith's message to TransCanada disclosed in the Proxy.

107. In December 2015, Columbia Pipeline completed its equity financing transaction. Defendants Skaggs and Kettering were nonetheless still actively planning their retirements through a merger or sale of the Company. On December 14, 2015, Skaggs sent Defendant Cornelius, the lead director of the Board, an email with an attachment called the "CEO Succession: Proposed Plan." The email listed three different approaches to replacing him as CEO of Columbia Pipeline. All three plans assumed that he would retire on July 1, 2016, the ultimate Effective Date of the Merger. Defendant Skaggs met with Cornelius to discuss these potential plans on December 15, 2015. He also met with Defendants Nutter, Kittrell, and Parker to discuss the same potential approaches on January 11, 14, and 15, 2016, respectively. According to an internal Goldman Sachs email from Mr. Gibson, Defendant Skaggs spent these meetings "priming the [Director Defendants] for a [TransCanada] bid."

108. Defendant Kettering was also planning his retirement. On December 7, 2015, in response to a message from Charles Moran, a senior Vice President of Columbia Pipeline, inviting Defendant Kettering to a management conference from April 6-8, 2016, Kettering replied "[p]ost retirement. Thanks."

### 5. Without Board Approval, Defendant Smith Re-Engages With TransCanada and Encourages TransCanada to Violate The Standstill Provision

109. In a coordinated breach of the TransCanada Standstill Provision, on December 15, 2015 – in the middle of the Columbia Pipeline equity offering – Mr. Poirier informed Defendant Smith that TransCanada "could be at ~$28.00 per share." Smith and Poirier continued their discussion on January 4, 2016 after the equity offering was complete.

110. On January 5, 2016, in preparation for a meeting scheduled for January 7, Defendant Smith sent TransCanada's Poirier certain Columbia Pipeline due diligence materials, including: (1) a draft of Columbia Pipeline's January 2016 management presentation; and redacted versions of (2) the WB Xpress Project & Board Run Connector; (3) the Leach Rayne Xpress Amended Business Case; (4) the Leach & Rayne Xpress Board Presentation; (5) the MXP-GXP Board Book; (6) the contract for WB Xpress; and (7) Precedent Agreements for XPress. These materials provided confidential information on certain of Columbia Pipeline's key pipeline projects. Mr. Poirier obtained these materials without approval of the Columbia Pipeline Board and in violation of the TransCanada Standstill Provision. None of these materials were available to any other bidder at this point in time, nor did the Proxy disclose that such materials had been provided to TransCanada at this time.

111. On January 7, 2016, Mr. Poirier met with Defendant Smith, again in violation of the TransCanada Standstill Provision and without Board approval, to discuss TransCanada's continuing interest in acquiring Columbia Pipeline. They also met to discuss TransCanada's desire to conduct additional due diligence on Columbia Pipeline for the next 30 to 45 days, all with the intention of making a firm merger proposal for the Company. This discussion between Defendant Smith and Poirier constituted a flagrant violation of the TransCanada Standstill Provision.

112. At the meeting, Defendant Smith gave Poirier a Management Presentation Update for Columbia Pipeline dated January 7, 2016. Defendants Kettering and Smith received the Management Presentation Update in an email dated January 6, 2016 from Dean Bruno, Vice President and Treasurer of Columbia Pipeline.

113. The Presentation highlighted positive developments on the Company's value and provided the Company's financial model for the next six years (the "0 & 12 Plan"). The 0 & 12 Plan contained highly confidential information about Columbia Pipeline's current and future business performance, including a plan to draw down $200 million of cash from a revolving line of credit held by the Company's affiliate, Columbia Pipeline Partners LP. None of this information had been provided to any other bidder at this point in time, nor did the Proxy disclose that such materials had been provided to TransCanada.

114. Also at the January 7 meeting, Defendant Smith provided Mr. Poirier a document entitled "Steve Smith Talking Points." In the document, Smith gave TransCanada guidance on how best to interact with the Columbia Pipeline Board concerning a merger. It included suggestions such as:

- "If [TransCanada] is serious Bob [Skaggs] and [TransCanada's CEO] should discuss terms in advance of our Board Meetings in January";
- "With our Board, it will come down to two issues: Price and Certainty";
- "I suggest that you 'lean in' on price as much as possible as every dollar matters a lot to our Board"; and
- "This is particularly true if you hope to avoid putting [Columbia Pipeline] 'in play'; Our Board needs to see a price as being 'preemptive.'"

115. After the January 7 meeting, Mr. Poirier provided both the 0 & 12 Plan and the Talking Points to Nancy Johnson, a member of TransCanada's corporate evaluations group, and Andrew Isherwood, a Senior Financial Analyst at TransCanada. Both made handwritten notes on

their copies of these documents. Ms. Johnson wrote that Defendant Smith had advised TransCanada that, "[*t*]***hey've eliminated the competition***," including Dominion, Berkshire and other potential bidders. Mr. Isherwood's notes reference the same companies that Columbia Pipeline had eliminated from merger consideration.

116. Ms. Johnson's notes also indicate that TransCanada was informed that there was a "gap between the [Columbia Pipeline] Board and management" on this issue, further demonstrating that Defendant Smith was acting without Board approval. Defendant Kittrell testified in the Appraisal Litigation that it would be "counterintuitive" for the Columbia Pipeline Board to authorize a communication to TransCanada about eliminating its competition for the Company because "you want to make sure you have provided an opportunity for any of those companies to come back" and "competition is good."

117. The January 7 meeting demonstrates that Defendant Smith was directing the sale of Columbia Pipeline to TransCanada, while allowing a blatant violation of the TransCanada Standstill Provision to disadvantage competing bidders. The Proxy revealed none of this to Columbia Pipeline shareholders. To the contrary, in reference to the January 7 meeting, the Proxy misleadingly stated that "[u]nlike TransCanada, none of [Dominion], [NextEra] or [Berkshire] sought to re-engage in discussions with [the Company] after discussions were terminated in November 2015." The Proxy omitted the material fact that each of these companies, including TransCanada, were actually ***restricted*** from merger discussions with Columbia Pipeline under the standstill provisions in their respective non-disclosure agreements.

118. This illicit and unauthorized activity with TransCanada continued for the next few weeks. On January 9, 2016, Joseph Christopher at Goldman Sachs emailed twenty TransCanada employees and nine Wells Fargo employees (copying Defendant Smith) to inform them that they

had all received access to a transaction data room the night before. Four additional TransCanada employees were granted access to the data room later that day. This access to due diligence materials was again a failure to enforce the TransCanada Standstill Provision and was made without Board approval. The Columbia Pipeline Board did not approve the granting of the Company's confidential business materials to TransCanada until late January 2016. As Defendant Cornelius, the lead director of Columbia Pipeline's Board, testified in the Appraisal Litigation, this "***wasn't a level playing field***."

119. That the Executive Officer Defendants were acting without Board approval was monumentally significant given that the Board had not yet decided that the Company should even be sold. Defendant Smith acknowledged this at his deposition in the Appraisal Litigation. Smith testified that he told TransCanada's Poirier on January 7, 2016 that the Board had not yet decided whether a sale would be necessary given the equity offering, and guided Mr. Poirier on how to approach the Columbia Pipeline Board in connection with encouraging a merger.

120. Defendant Smith and Mr. Poirier continued to negotiate merger terms in violation of the TransCanada Standstill Provision. On January 10, 2016, Poirier reported in an email to the TransCanada team working on the deal that he had "a daily call with [Columbia Pipeline]'s CFO," and that he would "brief everyone on our applications on [a different] call."

121. On January 23, 2016, Christine Johnston (TransCanada VP) sent Mr. Poirier a copy of an email she had written the day before to Defendant Skaggs with the subject line "Draft email to [Columbia Pipeline] GC." There is no record the email was ever sent to Columbia Pipeline. In the email, she acknowledged that the TransCanada Standstill Provision precluded merger negotiations with Columbia Pipeline (including the prior merger negotiations between Smith and Poirier). The email stated:

> "As I expect you may be aware your CFO has been involved in arranging a call between [TransCanada]'s CEO and [Columbia Pipeline]'s CEO which is to take place at the end of today. My understanding is that while there may be some broad discussion regarding valuation of [Columbia Pipeline], this conversation will not constitute an offer nor a proposal to acquire the securities of [Columbia Pipeline] nor constitute any other action that would be precluded by the standstill provisions found in Section 3 of the letter agreement between our companies dated November 9, 2015 (the Standstill).
>
> If however, after that meeting and after discussions with your board, your board is receptive to continuing the discussions, we would like assurance that in the event a verbal or written offer or proposal is made by [TransCanada] to the [Columbia Pipeline] CEO or Board, [TransCanada] would not be in contravention or breach of its obligations under the Standstill. I note specifically that the [Columbia Pipeline] board of directors is to "specifically request in writing in advance" any of the matters covered in section 3. I expect that you can appreciate that we don't want to be in a position where we contravene our agreement with your company."

122. On January 25, 2016, TransCanada advised Defendant Skaggs that it was interested in making an all-cash bid in the range of $25 to $28 per share. Without seeking prior authorization from the Columbia Pipeline Board, Skaggs told a TransCanada representative that such a range would be acceptable, though the bid would need to be at the top end. The Columbia Pipeline Board had not waived the TransCanada Standstill Provision at this time.

123. The Columbia Pipeline Board did not approve the provision of the Company's confidential business materials to TransCanada until late January 2016. Specifically, at the January 28-29, 2016 executive session of the Board, Defendant Skaggs reported "that TransCanada would not be willing to undertake the additional time and expense required to do further due diligence and negotiate definitive transaction documentation unless the Company were to agree to provide TransCanada with exclusivity." However unbeknownst to the Board, TransCanada ***already had*** exclusive access to 0 & 12 Plan, Steve Smith Talking Points, and the transaction data room for weeks and was actively conducting due diligence on Columbia Pipeline.

124. The Board's January 28-29, 2016 executive session minutes reveal that the Board reviewed the 0 & 12 Plan that had already been provided to TransCanada. Later at that meeting,

the Board "approved providing such preliminary plan, including the financial forecasts contained therein, to the Company's financial advisor and TransCanada." The Board did not know that Defendant Smith had already provided TransCanada with a copy of the 0 & 12 Plan at his meeting with Mr. Poirier on January 7. In fact, there was no mention of the January 7 meeting in the minutes for the January 28-29 executive session of the Board. Nor was the January 7 meeting addressed in the "BoardVantage" email Defendant Skaggs sent to the Board on January 26, 2016 with the executive session agenda. Defendant Smith was blatantly acting without Board approval when he shared this extremely confidential information with TransCanada on January 7.

125. Given the active merger negotiations with TransCanada in violation of the TransCanada Standstill Provision, TransCanada was the only visible bidder left in the process at the end of January 2016. Accordingly, at the January 28 executive session, the Columbia Pipeline Board authorized the execution of a 30-day exclusivity agreement with TransCanada to conduct merger negotiations.

126. Also on January 28, Columbia Pipeline and TransCanada entered into an addendum to their non-disclosure agreement to permit certain representatives of TransCanada access to Columbia Pipeline's unredacted precedent agreements (the "Precedent Agreements"). The Precedent Agreements are contracts between Columbia Pipeline and its customers that oblige those customers to sign subsequent binding transportation agreements with the Company. The Precedent Agreements allowed Columbia Pipeline to make revenue projections of fifteen years or more, and allowed the Company to be certain that 90% or more of those revenues are actually under contract.

127. For example, on the Mountaineer Xpress pipeline project, Columbia Pipeline executed binding precedent agreements with eight shippers for approximately 98% of the project's available transportation services. These agreements were for a primary term of fifteen years with

the project shippers electing to pay negotiated rates. Therefore, the Company definitively knew 98% of the Mountaineer Xpress pipeline's worth for the next fifteen years. The specific terms of those Precedent Agreements were clearly vital to a prospective buyer of the Company. TransCanada was the only bidder who received unredacted access to Columbia Pipelines' Precedent Agreements. This was not disclosed in the Proxy.

### 6. The Company Enters A Thirty Day Exclusivity Period With TransCanada, Further Disadvantaging Other Bidders

128. The Company and TransCanada agreed to enter a 30-day exclusivity agreement beginning on February 1, 2016 and ending at 5:00 p.m., Central Time, on March 2, 2016. Under the terms of the exclusivity agreement, TransCanada was required to notify Columbia during the exclusivity period if TransCanada was no longer interested in pursuing a potential transaction on terms at least as favorable to the stockholders of Columbia as $25 to $28 per share of Columbia stock. The exclusivity period would automatically terminate upon receipt of such notice. Also, under the terms of the exclusivity agreement, Columbia Pipeline could not solicit bids or provide due diligence to any party that did not first provide a bona fide written unsolicited acquisition proposal. This effectively barred other companies from bidding as no potential bidder had the due diligence necessary to provide a bona fide written acquisition proposal.

129. Columbia Pipeline and TransCanada proceeded to negotiate merger terms notwithstanding the fact that the TransCanada Standstill Provision had not yet been formally waived by Columbia Pipeline's Board.

130. On February 3, 2016, representatives of Columbia Pipeline and TransCanada held a conference call to discuss preliminary considerations around transaction structure. In their discussions from February 8 through February 12, 2016, TransCanada's representatives indicated that a tender offer structure would not be feasible given certain tax and financing considerations.

On February 16, 2016, TransCanada provided additional information to Columbia Pipeline regarding TransCanada's financing plan.

131. On February 17, 2016, TransCanada sent a revised draft of the proposed Merger Agreement to Columbia Pipeline. On February 22-24, 2016, Columbia Pipeline and TransCanada met to negotiate the terms of the Merger Agreement, including certain employee matters.

132. On February 24, 2016, TransCanada's CEO informed Defendant Skaggs that TransCanada would require additional time to develop a financing plan to support an acquisition of Columbia Pipeline within the range of $25 to $28 per share. TransCanada's CEO indicated that TransCanada would be prepared to commence price negotiations with Columbia Pipeline during the week of February 29, 2016, assuming its financing plan was in place.

133. On February 27, 2016, TransCanada sent a revised draft of the Merger Agreement to Columbia Pipeline. On March 1 and March 2, 2016, Columbia Pipeline and TransCanada met again to negotiate the terms of the Merger Agreement. During those meetings, TransCanada provided Columbia Pipeline with additional details regarding TransCanada's financing plans for the transaction.

**7. Columbia Pipeline and TransCanada Extend The Exclusivity Period**

134. On March 2, 2016, Columbia Pipeline and TransCanada executed a letter agreement extending their exclusivity agreement through 11:59 p.m., Central Time, on March 8, 2016.

135. On March 4, 2016, the Columbia Pipeline Board finally waived the TransCanada Standstill Provision. The Proxy noted that the Board made this waiver decision "[b]ecause the non-disclosure agreement between TransCanada and [Columbia Pipeline] prohibited TransCanada from making a proposal absent an invitation to do so from the Board."

136. Also on March 4, the Board concluded that the standstill provisions in the non-disclosure agreements with Dominion, NextEra and Berkshire should be waived prior to entry into a merger agreement with TransCanada. However, the standstill provisions for Dominion, NextEra and Berkshire were not actually waived until March 12, 2016. Thus, as detailed below, the standstill provisions for Dominion, NextEra and Berkshire were waived on the ***same day*** Columbia Pipeline extended its exclusivity agreement with TransCanada for a third time, and only ***five days*** before the TransCanada Merger Agreement was executed. The Proxy did not disclose this fact, or even the existence of the standstill provisions that precluded Dominion, NextEra and Berkshire from making a bid to acquire Columbia Pipeline without written Board approval.

137. Following the waiver of the TransCanada Standstill Provision, Columbia Pipeline formally invited TransCanada to make an offer on the Company. On March 4, 2016, Defendant Smith emailed Christine Johnston and Kristine Delkus of TransCanada, writing:

> "The Board has authorized me to advise you that the board of [Columbia Pipeline] requests an offer from [TransCanada] for a Transaction (as defined in the confidentiality agreement between the parties) at the meetings or calls between the CEOs scheduled for march 5th and in all other discussions between [TransCanada] and [Columbia Pipeline] and their representatives prior to the Expiration Time as defined in the Exclusivity Agreement, as amended."

This written invitation to make a proposal expired with the exclusivity agreement on 11:59 p.m., Central Time, on March 8, 2016.

138. On March 5, 2016, Mr. Poirier called Defendant Smith to indicate that TransCanada might make an offer of $24 per share, which was below its previously stated range. Smith conveyed Columbia Pipeline's expectation that TransCanada's proposal would be closer to $26.50 per share. He further conveyed that Company management expected TransCanada's proposal to be, at the very least, in the range indicated by TransCanada's CEO on January 25, 2016 (*i.e.*, $25 to $28 per share). That range was the basis for Columbia Pipeline entering into the exclusivity

agreement with TransCanada. Later on March 5, TransCanada proposed acquiring Columbia Pipeline for $25.25 per share. The Columbia Pipeline Board rejected that offer.

139. On March 6, 2016, a representative of Wells Fargo Securities, LLC, TransCanada's financial advisor, called a representative of Goldman Sachs to convey that he could not foresee TransCanada's management or board supporting an acquisition price of $26.50 per share. However, he indicated that TransCanada might be willing to re-convene its board for authority to increase its offer price above $25.25 per share.

140. Later on March 6, 2016, Defendant Smith called Mr. Poirier to request that TransCanada consider making a revised proposal at $26 per share. Smith noted that the Columbia Pipeline Board had not approved that price, and there was no assurance that the Board would authorize a transaction at this price.

141. At 11:59 p.m., Central Time on March 8, 2016, the amended exclusivity agreement and Columbia Pipeline's written invitation for TransCanada to make an acquisition proposal expired.

142. Nonetheless, on March 9, 2016, Defendant Smith received a call from Mr. Poirier, during which Poirier outlined an offer for TransCanada to acquire Columbia Pipeline at $26 per share. Under this proposal, 10% of the consideration would be comprised of TransCanada common stock and the remainder comprised of cash with a termination fee of 4.5% of the transaction value. The Columbia Pipeline Board determined that the termination fee was unacceptably high but was willing to continue negotiating with TransCanada.

**8. Columbia Pipeline Rebuffs An Offer From The Only Bidder Not Bound By A Standstill Provision.**

143. On March 10, 2016, *The Wall Street Journal* reported that TransCanada was in advanced Merger negotiations with Columbia Pipeline. The very next day, Spectra, the only

engaged bidder who had not signed a non-disclosure agreement (and therefore not subject to a standstill provision) approached Columbia Pipeline for a ***third time*** to discuss an acquisition bid. Columbia Pipeline was not subject to an exclusivity agreement with TransCanada at this point in time and was free to engage in merger negotiations with Spectra.

144. Specifically, on March 11, 2016, Spectra's CEO, Greg Ebel, immediately informed Defendant Skaggs that Spectra was interested in acquiring Columbia Pipeline and requested that Skaggs tell him "***as soon as possible*** when we may speak or get our teams together to determine how best to realize the[] potential opportunities for our stockholders."

145. On March 11, 2016, Spectra's CEO also left a telephone message for Will Bousquette, a member of the Goldman Sachs transaction team. Mr. Bousquette emailed the Executive Officer Defendants before returning the call. The General Counsel of Columbia Pipeline, Bob Smith, replied to Mr. Bousquette and indicated that there is "***not a lot of interest in engaging with Spectra***." He further responded to Mr. Bousquette by stating "[p]lease note that we want you to handle interactions with them ***rather than opening up discussions between management***." Nonetheless, Mr. Bousquette indicated that the Executive Officer Defendants should still expect an email from Spectra as soon as that afternoon.

146. Later that day, Spectra's CEO emailed Defendant Skaggs, stating in part,

> "Given the news of recent days regarding [Columbia Pipeline], I wanted to be sure you knew that ***we believe we could offer your shareholders a premium of [Columbia Pipeline]'s recent trading value and, by offering [Spectra] shares in exchange, the resulting dividend could be approximately double what your shareholders currently receive*** . . . [W]e believe we would ***only need a short time*** to confirm our assumptions with you and be in a position to present a proposal for you to consider."

147. Because TransCanada's exclusivity agreement had expired at this point, Columbia Pipeline was entirely free to negotiate a higher and more competitive bid with Spectra. The

Company was also free to use Spectra's clear indication of bidding interest as leverage with TransCanada in order to negotiate a higher price. Defendants did neither.

148. Instead, on March 12, 2016, the Columbia Pipeline Board convened and decided to inform TransCanada that they had received an inquiry from a "credible, large, midstream player." Rather than asking TransCanada to increase its offer in light of this significant development, Defendants asked for TransCanada's input on Columbia Pipeline's scripted response to the Spectra inquiry and to any future inquiries that might be received from other bidders. Defendant Smith purportedly asked for TransCanada's input in order to ensure that Columbia Pipeline was not in violation of the TransCanada exclusivity agreement. However, the two companies were not currently bound by any such agreement.

149. Later on March 12, Columbia Pipeline's General Counsel emailed his counterpart at TransCanada asking for approval of the scripted message to Spectra and other bidders. He wrote that Columbia Pipeline would enter into an exclusivity agreement with TransCanada, "subject to your agreement that this scripted response would not violate the terms of the exclusivity agreement (both in terms of the inbound received in the [exclusivity agreement's] gap period and going forward until signing, which ***unfortunately, given the leak, there is a potential that we will receive additional such inquiries***)." Clearly, Columbia Pipeline was giving TransCanada preferential treatment over any other bidder and had an express disinterest in negotiating with other bidders. Later that day, TransCanada's General Counsel approved the scripted message to Spectra and other bidders.

150. Goldman Sachs responded to Spectra by telephone on March 12 with the following scripted message created by Columbia Pipeline management:

> "We will not comment on market speculation or rumors. With respect to indications of interest in pursuing a transaction, we will not respond to anything other than serious written proposals."

In response, Spectra's CEO informed Goldman Sachs that Spectra had run the numbers but that it was "tough to be specific from the outside" because Columbia Pipeline "hadn't provided much of a public forecast." He indicated that Spectra "[could] be more specific subject to diligence from Columbia Pipeline." Despite this, Defendants provided no Company due diligence materials to Spectra even though Spectra was not subject to a standstill provision and there was no exclusivity agreement between Columbia Pipeline and TransCanada at the time.

151. Notwithstanding Defendants' stonewalling of Spectra, Spectra's CFO reported internally that he believed it was not too late in the process for Spectra to seriously pursue a merger with Columbia Pipeline.

152. Accordingly, later that day, even after Spectra received the scripted message, Spectra's CFO called Goldman Sachs to follow up on the March 11 email from Spectra's CEO which proposed a premium for acquiring Columbia Pipeline. Will Bousquette from Goldman Sachs reported in writing to Defendants Smith and Skaggs on his call with Spectra. He asked Defendants Smith and Skaggs to "[l]et me know if you want me to call you for a quick post or email." Rather than seeking more information on Spectra's proposal, Defendant Skaggs responded, "Thanks, Will. ***There is no need for a call***. We'll simply stand by." Mr. Bousquette replied with "key commentary from" the Spectra CFO including that the Spectra team could "***move quickly***."

153. Later on March 12, 2016, also after Spectra received the scripted message, Guy Buckley, Spectra's Chief Development Officer, called Will Bousquette at Goldman Sachs to further discuss a transaction with Columbia Pipeline. After this call, Mr. Bousquette told

Defendants Skaggs and Smith that when Spectra becomes "serious" about a transaction, Buckley "tends to drive," and that Mr. Buckley's call "***can be interpreted as a sign that they're doing real work over there***." Mr. Bousquette concluded that "absent a major bust, we should expect to see something from Spectra ***in the next few days***."

154. Also on March 12, 2016, Adam Ward from Capital Research, one of Columbia Pipeline's largest shareholders, contacted the Company and stated that "[w]e feel strongly that given the [$26 per share] bid from TransCanada you should start a strategic review and test the market." He further indicated that Capital Research was not adverse to owning stock in TransCanada *or* other companies in the same market. This message was conveyed to the Executive Officer Defendants on March 13, 2016.

#### 9. Columbia Pipeline and TransCanada Enter Into a Third Exclusivity Period and Strike a Deal

155. Despite Spectra's clear intention to make an imminent bid for the Company, on March 12, 2016, Columbia Pipeline and TransCanada entered into a third exclusivity agreement lasting through 5:00 p.m., Central Time, on March 18, 2016. TransCanada had requested a two-week period but instead, despite knowing that Spectra would be making a formal offer "in the next few days," Defendants countered with a one-week exclusivity period to further rush the transaction with TransCanada.

156. Under the terms of the new exclusivity agreement, TransCanada was required to notify Columbia Pipeline if TransCanada was no longer interested in pursuing a potential transaction on terms at least as favorable as $26 per share of Columbia stock. The new exclusivity period would automatically terminate upon receipt of such notice. Additionally, under the terms of the exclusivity agreement, Columbia Pipeline could not solicit bids or provide due diligence to any party that did not first provide a bona fide written unsolicited acquisition proposal. This

effectively barred other companies from bidding as no potential bidder had the due diligence necessary to provide a bona fide written acquisition proposal.

157. Also on March 12, 2016, Columbia Pipeline sent NextEra, Berkshire, and Dominion waivers to their respective standstill provisions. The Company waived "Section 3 of the Confidentiality Agreement to the extent (and solely to the extent) that it prohibit[ed each bidder] and its Representatives from making an offer directly to the board of directors of the Company (the "Board") with respect to a Transaction." Notwithstanding this, these bidders were not granted access to any of Columbia Pipeline's current due diligence materials. Moreover, they had been required to destroy the Company's prior due diligence materials in November 2015.

158. These standstill waivers were granted on the authority of the Columbia Pipeline Board. On March 11, 2016, Defendant Skaggs sent an email stating that "to align with our Fiduciary duties, prior to executing a new Exclusivity Agreement with [TransCanada], we will release the standstill provision in the other NDAs." Defendant Skaggs' email demonstrated an understanding that the Board and Executive Officer Defendants needed to entertain offers from other bidders in order fulfill their fiduciary duties.

159. That day the Board told management to waive the standstill provisions stating that the Board wished "to waive the 'standstill' provisions in the confidentiality agreements between the Company and the parties (other than TransCanada) that had conducted due diligence on the Company in 2015 which prohibited such parties from making a proposal to the Board without the express invitation to do so by the Board." The Board was therefore aware that until March 12, 2016, Dominion, NextEra and Berkshire had not been legally allowed to participate in merger negotiations since November 25, 2015. The Board and the Executive Officer Defendants breached

their fiduciary duties by entering into repeated exclusivity periods with TransCanada without allowing other bidders to make viable acquisition proposals.

160. TransCanada lowered its acquisition bid given the assurance that it was protected by a renewed exclusivity agreement and with the knowledge that Defendants had rejected Spectra's bona fide acquisition efforts. On March 14, 2016, TransCanada orally presented to Columbia Pipeline a reduced offer of $25.50 per share. TransCanada also threatened to publicly announce a termination of the merger discussions if this offer was not accepted within three days.

161. Defendant Skaggs stated in an email that day to the Board, Smith, and Goldman Sachs representatives that "[w]e are proceeding to schedule and make a NetJets charter flight arrangement for a Wednesday in-person Board meeting in Houston." Until the very end, Defendant Skaggs was forcing the TransCanada transaction forward despite knowing that other bidders had been excluded.

162. On March 17, 2016, Columbia Pipeline entered into a definitive agreement to be acquired by TransCanada for $25.50 per share in cash. The Merger Agreement was executed less than one year after the Spinoff and only ***five days*** after NextEra, Dominion, and Berkshire were released from their standstill provisions. The Merger was also agreed upon without consideration of the formal acquisition proposal Spectra indicated it was preparing five days earlier. Defendant Smith acknowledged in the Appraisal Litigation that it would take longer than a week for a company like Spectra or Dominion to put together a credible proposal in writing.

163. The Merger Agreement contained several deal protection provisions that would have made it extremely difficult and unappealing for another company to make an offer for the Company at this time. Specifically, the Merger Agreement contained a "no-shop" provision, under which the Company could not solicit or provide any information that could reasonably be expected

to lead to an acquisition proposal, unless it received an unsolicited bona fide written acquisition proposal first. In addition, the Merger Agreement contained a clause stating that the Board could not recommend any other acquisition proposal or withdraw its recommendation for the Merger Agreement. The Merger Agreement also contained provisions making it financially difficult for any company to top TransCanada's offer. The agreement contained a matching rights provision, under which TransCanada could match any offer the Company received; a 3% termination fee, which amounted to $309 million; and partial reimbursement of TransCanada's due diligence costs of up to $40 million. These provisions ensured that no other company (including Spectra, Dominion, NextEra or Berkshire) would have the incentive to invest the financial resources into performing due diligence to make an offer for Columbia Pipeline after the Merger Agreement was executed.

164. Later on March 17, Defendant Smith emailed Rick Rivera, his financial counselor, and asked "***do you think I can retire now***?" The Merger closed on July 1, 2016, the date that Defendant Skaggs had been targeting for his retirement all along.

165. The Executive Officer Defendants retired a few days after the Merger closed. Defendant Skaggs received approximately $26.84 million upon retirement—$17.9 million more than he would have received had he retired without a change-in-control transaction. Defendant Smith received $10.89 million—$7.5 million more than he would have received had he retired without a change-in-control transaction. Defendant Kettering received $8.38 million in retirement benefits—$6.1 million more than he would have received had he retired without a change-in-control transaction. The Executive Officer Defendants collectively received $40,424,213 from Columbia Pipeline that they would not have otherwise been entitled to without their planned Spinoff and sale of the Company.

166. The Director Defendants also reaped enormous profits from the Merger. Through an immediate vesting of their restricted stock units upon the change-in-control Merger, Defendant Cornelius received $363,094.50; Defendant Kittrell received $660,501; Defendant Nutter received $1,194,165; Defendant Parker received $1,184,398.50; Defendant Silverman received $131,172; and Defendant Taylor received $431,638.50. These amounts represented significant increases in the Director Defendants' typical annual compensation, which ranged between $45,000 to $70,000 in 2015.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT IN THE PROXY

167. On May 17, 2016, Columbia Pipeline filed its definitive Proxy statement, including the Merger Agreement, with the SEC on Form DEFM14A and mailed it to Columbia Pipeline shareholders. The Proxy stated that it was issued "by order of the Board of Directors" of Columbia Pipeline and "as part of the solicitation of proxies by the Board" of Columbia Pipeline.

168. The Proxy, which included a cover letter signed by Defendant Skaggs, explained the terms and conditions of the Merger to shareholders, purported to inform them about the background of the Merger, and set forth the reasons why the Company and Director Defendants recommended that shareholders vote in favor of the Merger. The Proxy also stated that the shareholder vote on the Merger would occur on June 22, 2016. The Proxy contained numerous materially false and misleading statements and omissions of material fact, which resulted in shareholders approving the Merger that was the product of an inherently unfair process. The material misstatements and omissions in the Proxy denied Lead Plaintiff and Class members an opportunity to make a fully informed decision in voting on the Merger.

### A. The Proxy Failed to Disclose That Columbia Pipeline Utilized Standstill Provisions to Eliminate TransCanada's Competition

169. The Proxy failed to disclose that the Executive Officer Defendants had engaged in merger negotiations with TransCanada by allowing violations of the TransCanada Standstill Provision and bypassing Board approval, while at the same time using ***undisclosed*** standstill provisions to prevent Dominion, NextEra and Berkshire from bidding on the Company. The Proxy further failed to disclose that in November 2015, Defendant Skaggs and TransCanada's CEO discussed entering into an exclusivity agreement with TransCanada which would favor it over other potential bidders.

170. Specifically, the Proxy stated that following the November 25, 2015 Board meeting Columbia Pipeline "terminated discussions with respect to a potential transaction" with TransCanada, "Party B" (Dominion), "Party C" (NextEra), and "Party D" (Berkshire) and "asked each party to return or destroy confidential information pursuant to the terms of their respective non-disclosure agreements."

171. The statement in ¶ 170 was materially false and misleading because it failed to reveal that pursuant to the undisclosed standstill provisions in the respective non-disclosure agreements with TransCanada, Dominion, NextEra and Berkshire, these parties could not seek to merge with Columbia Pipeline, or even request an amendment to their standstill provisions, without first receiving written permission from the Columbia Pipeline Board.

172. This statement further omitted that Defendant Skaggs had already discussed an exclusivity agreement with TransCanada's CEO, indicating a clear preference for TransCanada over the other bidders (*i.e.*, Dominion, NextEra and Berkshire). Specifically, in an email dated November 25, 2015, Keith Conley from TransCanada informed his co-worker Catherine Davis that Defendant Skaggs indicated to TransCanada's CEO that he would talk to the Columbia

Pipeline Board at the November 25 Board meeting about an exclusivity agreement with TransCanada. Moreover, in a November 25 telephone conversation, Defendant Smith indicated to Francis Poirier (TransCanada's SVP for Strategy and Corporate Development) that Columbia Pipeline would probably want to pick up the merger discussion with TransCanada again "in a few months." No similar message was conveyed to the other bidders. Nor did the Proxy disclose that this message indicating a clear interest in re-engaging in merger negotiations had been conveyed to TransCanada.

173. The statement in ¶ 170 also failed to disclose that Columbia Pipeline and TransCanada continued to discuss merger terms while the Company's equity offering was underway. In a coordinated breach of the TransCanada Standstill Provision, on December 15, 2015 – in the middle of the Columbia Pipeline equity offering – Mr. Poirier informed Defendant Smith that TransCanada "could be at ~$28.00 per share" of Columbia Pipeline common stock for a merger. Messrs. Smith and Poirier continued their merger discussion on January 4, 2016 after the Columbia Pipeline equity offering was complete. As further detailed below, the Proxy concealed that TransCanada continued to negotiate merger terms with Defendant Smith in violation of the TransCanada Standstill Provision.

174. In addition to utilizing the standstill provisions, Defendants worked to deter competing bids from Dominion and NextEra in November 2015 by not informing them of an important bid deadline. The Proxy misled shareholders by stating that on November 24, 2015, "Party B [Dominion] did not submit an indication of interest (either individually or jointly with Party C [NextEra]." This statement was materially false and misleading because if failed to disclose the fact that neither Dominion nor NextEra were told that any merger bids needed to be made by November 24, 2015 for Board consideration at its meeting on November 25. In contrast,

Defendants Skaggs and Smith explicitly notified both TransCanada and Berkshire of this deadline, leading both entities to make merger bids that were considered at the Columbia Pipeline Board meeting on November 25, 2015.

### B. The Proxy Omitted That TransCanada Was Provided Due Diligence Materials Without Board Approval

175. The Proxy stated that on January 7, 2016, pursuant to a request from Mr. Poirier of TransCanada, he met with Defendant Smith and indicated that "TransCanada was still interested in acquiring [Columbia Pipeline] and wanted to conduct due diligence for 30 to 45 days in order to formulate a firm proposal." The Proxy further stated that *"[u]nlike TransCanada, none of Party B* [Dominion]*, Party C* [NextEra] *or Party D* [Berkshire] *sought to re-engage in discussions with* [Columbia Pipeline] *after discussions were terminated in November 2015*."

176. The statements set forth in ¶ 175 were materially false and misleading because they again failed to disclose (i) the existence and terms of the standstill provisions entered into between the Company and Dominion, NextEra and Berkshire, respectively; (ii) that under these standstill provisions, Parties B, C and D (*i.e.*, Dominion, NextEra, and Berkshire), as well as TransCanada, were *explicitly prevented from taking any steps toward acquiring the Company* without approval from the Columbia Pipeline Board; and (iii) that at the January 7 meeting, Defendant Smith told Mr. Poirier that "[***th***]***ey've eliminated the competition***" and identified who those eliminated competitors were.

177. The statement in ¶ 175 also omitted the material fact that prior to and during their January 7 meeting, Defendant Smith provided Mr. Poirier with confidential information concerning Columbia Pipeline's business. Specifically, on January 5, 2016, Defendant Smith provided Poirier with Columbia Pipeline due diligence materials that included: (1) a draft of Columbia Pipeline's January 2016 management presentation, and redacted versions of (2) the WB

Xpress Project & Board Run Connector; (3) the Leach Rayne Xpress Amended Business Case; (4) the Leach & Rayne Xpress Board Presentation; (5) the MXP-GXP Board Book; (6) the contract for WB Xpress; and (7) Precedent Agreements for XPress. These materials provided information on certain of Columbia Pipeline's key pipeline projects.

178. At the January 7 meeting, Defendant Smith also gave Mr. Poirier a Management Presentation Update for Columbia Pipeline dated January 7, 2016, which highlighted positive developments for the Company's value. In addition, Defendant Smith provided Columbia Pipeline's "0 & 12 Plan" to Mr. Poirier. The 0 & 12 Plan was a business and financial model with confidential information on Columbia Pipeline's current and future business performance.

179. The Columbia Pipeline Board had yet to review or approve the 0 & 12 Plan, let alone agree to its dissemination to TransCanada. In fact, in the Appraisal Litigation, the lead director of the Board testified that "I didn't authorize any of this…No, ***this wasn't a level playing field and [the Board] didn't authorize any of this***." At the January 7 meeting, Defendant Smith also provided Mr. Poirier a document entitled "Steve Smith Talking Points," which provided key insights into how TransCanada should approach the Columbia Pipeline Board in encouraging and negotiating a merger. The Proxy did not disclose that any of this information was provided to Mr. Poirier at his January 7, 2016 meeting with Mr. Smith or anytime thereafter. Nor did the Proxy disclose that TransCanada was provided with this due diligence material without approval from the Columbia Pipeline Board and in a coordinated breach of the TransCanada Standstill Provision.

180. The Proxy also failed to disclose that on January 9, 2016, twenty TransCanada employees were granted access to a transaction data room in connection with TransCanada's merger due diligence. Nine Wells Fargo employees, who were advising TransCanada on a merger with Columbia Pipeline, were also granted access to the transaction data room at this time.

181. The Columbia Pipeline Board did not approve providing TransCanada with due diligence materials in furtherance of a merger until the Board meeting on January 28-29, 2016. It was at this meeting that the Board first saw and approved the Company's confidential 0 & 12 Plan that had been given to TransCanada ***over twenty days earlier***.

182. The Proxy further stated that "on January 28, Columbia Pipeline and TransCanada entered into an addendum to their non-disclosure agreement to provide procedures to permit certain representatives of TransCanada access to certain specific confidential information regarding" Columbia Pipeline.

183. The statement in ¶ 182 was materially false and misleading because it omitted the material fact that the "confidential information" provided to TransCanada on January 28 was Columbia Pipeline's crucial Precedent Agreements. The Precedent Agreements allowed Columbia Pipeline to make revenue projections of fifteen years or more, and gave the Company certainty that 90% or more of those revenues were actually under contract. Accordingly, the Precedent Agreements provided highly confidential and relevant Company information to TransCanada as a prospective buyer of the Company. TransCanada was the only bidder who received unredacted access to Columbia Pipelines' Precedent Agreements. This critical advantage given to TransCanada in the bidding process was not disclosed to Company shareholders.

### C. The Proxy Misrepresented the Ability of Dominion, NextEra and Berkshire to Bid on Columbia Pipeline

184. The Proxy materially misrepresented the ability of Dominion, NextEra and Berkshire (*i.e.*, Parties B, C, and D referenced in the Proxy) to make actual bids to acquire Columbia Pipeline given the standstill provisions in their respective non-disclosure agreements. Relatedly, the Proxy materially misrepresented that the Company was able to consider alternate bids notwithstanding its exclusivity agreement with TransCanada.

185. In addressing the Company's exclusivity agreement with TransCanada, the Proxy stated that:

> "notwithstanding the exclusivity restriction during the exclusivity period, [Columbia Pipeline] was able to engage with, provide due diligence information to and potentially enter into a transaction with any third party that provided [Columbia Pipeline] with a bona fide written unsolicited acquisition proposal so long as the Board determined in good faith, after consultation with its outside legal counsel, that the failure to take such action would reasonably be expected to be a breach of the Board's fiduciary duties."

This was referred to as the "fiduciary out" provision in the Columbia Pipeline-TransCanada exclusivity agreement.

186. The statement in ¶ 185 was materially false and misleading because the standstill provisions in the respective non-disclosure agreements between Columbia Pipeline and Dominion, NextEra and Berkshire expressly precluded these entities from making any such acquisition proposal to the Company. Specifically, the standstill provisions in these agreements prevented Dominion, NextEra and Berkshire from "offer[ing] to acquire, or seek[ing], propos[ing] or agree[ing] to acquire . . . beneficial ownership . . . of [Columbia Pipeline]." In fact, the standstill provision prohibited these entities from even ***contacting*** Columbia Pipeline representatives about the standstill or seeking an amendment or waiver of the standstill.

187. Dominion, NextEra and Berkshire were simply unable to make any "bona fide written unsolicited acquisition proposal" as suggested in the Proxy. Accordingly, the purported "fiduciary out" provision in the Columbia Pipeline-TransCanada exclusivity agreement in no way lessened the agreement's restriction on competing bids. The Proxy gave the misleading impression that competing bidders such as Parties B, C, and D (*i.e.*, Dominion, NextEra and Berkshire) were free to make merger proposals notwithstanding the exclusivity agreement, when, in fact, the opposite was true. Indeed, as of November 25, 2015, Columbia Pipeline had terminated

discussions with Dominion, NextEra and Berkshire and directed them to destroy all Company due diligence materials.

188. The Proxy also listed certain "material factors" considered by the Board in approving the Merger with TransCanada and recommending its adoption by Company shareholders. One such factor stated in the Proxy was that "none of Party A, Party B, Party C or Party D would be subject to standstill obligations that would prohibit them from making an unsolicited proposal to the Board following announcement of entry into the merger agreement with TransCanada."

189. The statement in ¶ 188 was materially misleading as it omitted the material fact that Parties B, C, and D (*i.e.*, Dominion, NextEra, and Berkshire) were precluded from obtaining due diligence materials on Columbia Pipeline under actual and ***undisclosed*** standstill provisions. Moreover, these standstill provisions were not waived until March 12, 2016 – the ***same day*** Columbia Pipeline extended its exclusivity agreement with TransCanada and ***only five days*** before the TransCanada Merger Agreement was executed on March 17. This made any effort by Dominion, NextEra and Berkshire to obtain Company due diligence and make a meaningful merger bid after the Merger Agreement was executed completely illusory. In addition, under the Merger Agreement, the Company was prohibited from providing any information or data to any person concerning an indication of interest, and included other deal protection provisions making it unfeasible for competing bidders to make topping bids.

190. In contrast, as noted above, TransCanada was provided extensive Columbia Pipeline due diligence materials several months earlier in a coordinated breach of the TransCanada Standstill Provision and without Board approval. Such access gave TransCanada an unfair and undisclosed advantage over the excluded bidders.

191. In short, the Proxy failed to disclose that Defendants worked to exclude other prospective buyers from bidding on the Company, to preference TransCanada over other prospective bidders, and to ultimately accept TransCanada's meager $25.50 per share offer.

**D. The Proxy Did Not Disclose That Spectra Was on the Verge of Making a Serious Bid to Acquire Columbia Pipeline**

192. On November 3, 2015, Spectra's CEO emailed Defendant Skaggs about entering into a potential strategic transaction. He wrote, in part, "I would like to get together in the next couple of weeks to discuss what we may be able to accomplish together." The Proxy omitted any reference to this outreach by Spectra.

193. The Proxy stated that on or about November 9, 2015, Defendant Skaggs had a telephone call with Spectra's CEO "regarding general industry and financial market conditions, during which Mr. Skaggs conveyed [Columbia Pipeline's] inclination to proceed with an equity financing transaction in the near term." This statement omitted that, as he acknowledged in his Appraisal Litigation testimony, Defendant Skaggs did not tell Spectra's CEO on this call that Columbia Pipeline's Board wanted to receive acquisition bids before its November 25 meeting. Defendant Skaggs had notified TransCanada and Berkshire of this deadline. The Proxy omitted that Defendant Skaggs clearly sought to discourage a bid by Spectra.

194. The Proxy further stated that on November 17, 2015, Defendant Skaggs informed the Board of Spectra's indication of interest, but had not "requested a substantive follow-up meeting or conversation." This statement was materially misleading as it omitted that Spectra's CEO had affirmatively reached out to Defendant Skaggs on November 3 to express his clear interest in a transaction, and requested a CEO-to-CEO meeting with Skaggs to discuss further.

195. Several months later, on March 10, 2016, the *Wall Street Journal* reported on a potential deal between Columbia Pipeline and TransCanada. The Proxy stated that on March 11,

2016, Defendant Skaggs received an email from the CEO of Spectra "indicating that Party A [Spectra] again had begun considering some of the possibilities of a combination of [Columbia Pipeline] and Party A [Spectra]. The email did not include any specifics about the structure of a transaction or details of the economic terms of such a transaction." The Proxy further stated that "The Chief Financial Officer of Party A [Spectra] called a representative of Goldman Sachs to indicate Party A's potential interest in acquiring [Columbia Pipeline]."

196. The statements set forth in ¶ 195 materially misrepresented Spectra's serious intention to bid on the Company immediately after learning in the *Wall Street Journal* that Columbia Pipeline was in merger talks with TransCanada. Specifically, there were a multitude of phone calls and emails between Goldman Sachs, Columbia Pipeline and several key executives at Spectra on March 11 and 12, 2016. Over the course of these two days: (1) the CEO of Spectra left a voice message for Will Bousquette at Goldman Sachs, (2) Mr. Bousquette returned that call and spoke to Spectra's CEO, (3) the CEO of Spectra emailed Skaggs stating Spectra would "only need a short time" of due diligence and requesting a meeting to discuss potential opportunities, (4) the CFO of Spectra called Goldman Sachs indicating that Spectra could "move quickly," and (5) Spectra's Chief Development Officer called Mr. Bousquette to indicate that Spectra would be bidding in "the next few days." While the Proxy generally enumerated certain of these steps taken by Spectra, it completely omitted that Spectra was on the verge of making an actual and serious merger bid.

197. Specifically, on March 11, 2016, Spectra's CEO emailed Defendant Skaggs to inform him that Spectra believed it could provide specifics about the terms of a transaction with only "a short time to confirm [their] assumptions" about the Company.

198. On March 12, 2016, Spectra's CFO called Goldman Sachs to follow up on Spectra's March 11 email, in which he reiterated that the Spectra team could "move quickly" on a merger bid. Later that day, Guy Buckley, Spectra's Chief Development Officer, called Mr. Bousquette at Goldman Sachs to discuss a merger with Columbia Pipeline. Immediately following that call, Mr. Bousquette emailed Defendants Skaggs and Smith indicating that he interpreted Mr. Buckley's call to be "a sign that they're doing real work over there." Mr. Bousquette's email also informed Defendants Skaggs and Smith that the Spectra executive team was working over their vacation in order to finalize a merger proposal. Mr. Bousquette concluded that "absent a major bust, we should expect to see something from Spectra in the next few days." This was not a casual series of generic exchanges as is characterized in the Proxy. The Proxy provided none of this detail demonstrating that Spectra was serious about an acquisition bid and was working hard to prepare its bid for Columbia Pipeline's consideration.

199. Additionally, the statements set forth in ¶ 195 materially omitted that the Defendants rebuffed Spectra's efforts to engage in merger negotiations at every available opportunity. Specifically, when Spectra's CEO initially reached out to Goldman Sachs on March 11, 2016, Columbia Pipeline's General Counsel informed Goldman that there is "***not a lot of interest in engaging with Spectra*** . . . we want you to handle interactions with them rather than opening up discussions between management." Later that day, when Spectra's CEO emailed Defendant Skaggs asking for meeting "***as soon as possible***," Skaggs did not respond. Instead, he ignored the outreach and had Goldman Sachs deliver a scripted response the following day which effectively closed further negotiations with Spectra. Indeed, despite the fact that Spectra's CEO specifically stated to Goldman Sachs that he needed Company due diligence to make a bid,

Defendants ignored that request and provided no due diligence to Spectra. Nobody from Columbia Pipeline ever responded to these clear indications of interest from Spectra.

200. The Proxy further stated that on March 16, 2016, just four days later, the Columbia Pipeline Board determined to reject any potential offer from Spectra, without waiting to be informed of its terms. The Proxy stated that the reason for this rejection was "there was no assurance that Spectra would make a formal written proposal in a timely matter [sic] or at all and the fact that the [TransCanada] exclusivity agreement prohibited [Columbia Pipeline] from soliciting any such proposal during the exclusivity period."

201. The statements set forth in paragraph ¶ 200 were materially false and misleading because the Executive Officer Defendants had already determined to reject Spectra's proposal. They had informed TransCanada of that intent, obtained its approval of the scripted Spectra rejection message, and unilaterally offered TransCanada exclusivity without obtaining anything in return or waiting to review and consider Spectra's imminently forthcoming bid to acquire Columbia Pipeline.

**E. The Proxy Failed to Disclose That Defendants Warned TransCanada of Merger-Related Tax Liability to Preserve its Merger Bid**

202. The Proxy materially omitted that Defendants informed TransCanada prior to the Spinoff that it was subject to significant tax liability if it engaged in merger negotiations with NiSource before Columbia Pipeline was spun-off.

203. Specifically, the Proxy omitted the material fact that on May 28, 2015, Lazard conveyed to TransCanada that Columbia Pipeline was planning a spinoff that would take effect on July 1, 2015, and that Columbia Pipeline "may be put into play shortly after." Lazard conveyed this message on behalf of Defendants. Lazard further warned TransCanada that it would be exposed to significant tax liability (*i.e.*, Reverse Morris Trust exposure) if it negotiated with

NiSource pre-Spinoff. Lazard reiterated this tax liability concern to TransCanada on at least one other call before the Columbia Pipeline Spinoff.

204. Internal TransCanada documents reflect that it viewed this tax liability to be approximately $3 billion, to be allocated between NiSource and any potential acquirer of Columbia Pipeline. Accordingly, this tax issue would effectively preclude any entity from negotiating prior to the Spinoff. Defendants tax tipoff to TransCanada therefore preserved TransCanada's ability to bid on Columbia Pipeline after the Spinoff. In contrast, other bidders for Columbia Pipeline did not receive this tax liability warning from either the Company or its bankers.

205. The Proxy materially misrepresented that the initial contact between Columbia Pipeline and TransCanada occurred on October 9, 2015, when Mr. Poirier (TransCanada's SVP for Strategy and Corporate Development) called Defendant Smith to request a meeting. This omitted the material fact that Lazard had informed TransCanada in May 2015 that Columbia Pipeline "may be put into play shortly after" its Spinoff from NiSource on July 1, 2015. This early tipoff to TransCanada allowed it months to consider and prepare for a merger with Columbia Pipeline, while also allowing it to avoid the substantial tax liability imposed by the Reverse Morris Trust rules.

206. The Proxy also materially omitted the fact that any entity that had communicated an indication of interest to NiSource in the pre-Spinoff period was subject to the Reverse Morris Trust tax liability. Specifically, if a company had merger discussions with NiSource prior to the Spinoff and then merged with Columbia Pipeline within two years of the Spinoff, U.S. tax law would subject it to a substantial tax penalty. Therefore, bidders who made pre-Spinoff indications of interest to NiSource were effectively barred from purchasing Columbia Pipeline for two years after the Spinoff.

207. TransCanada understood this and how it would effectively diminish competition for an acquisition of Columbia Pipeline, thus allowing TransCanada to bid lower. TransCanada's internal emails reveal that they believed the Reverse Morris Trust tax liability prevented other bidders from buying Columbia Pipeline after the Spinoff. One of those bidding companies was Enbridge, Inc. According to TransCanada "Enbridge may have had prior discussions with NiSource that could impact the tax-free status of the spin of Columbia." Thus, TransCanada understood that other Columbia Pipeline bidders were at risk of the tax liabilities imposed by the Reverse Morris Trust issues. In contrast, TransCanada was able to avoid such tax liability given Defendants' undisclosed tipoff.

208. The failure to make these disclosures deprived the shareholders of material information relevant to their consideration of whether TransCanada's offer reflected the fair value of Columbia Pipeline's common stock.

### F. Proxy Failed to Disclose That the Executive Officer Defendants Planned the Spinoff and Ultimate Sale of Columbia Pipeline To Quickly Retire With Lucrative Change-In-Control Benefits

209. The "Background of the Merger" section materially omitted the Executive Officer Defendants' intent prior to the Spinoff to quickly sell the Company and retire after the Spinoff with lucrative change-in-control benefits. The Proxy failed to state that Defendant Skaggs maneuvered to ensure that the Executive Officer Defendants obtained new positions at Columbia Pipeline which would entitle them to lucrative change-in-control benefits they would not have otherwise received without a Spinoff and merger. Specifically, the NiSource board of directors had considered appointing either Defendant Smith or Kettering to replace Skaggs as CEO of NiSource following the Spinoff. However, Defendant Skaggs successfully campaigned for another CEO candidate. This left Defendants Smith and Kettering eligible for positions at the new Company and secured their enhanced change-in-control benefits once Columbia Pipeline was sold.

210. In addition, the Proxy fails to reveal that Defendant Skaggs argued that Defendants Kettering and Smith should receive ***three*** times (instead of twice) their current annual base salary and target incentive bonus compensation for three years after the Spinoff. NiSource granted Defendant Skaggs' request and increased all of the Executive Officer Defendants' change-in-control benefits accordingly for a three-year period. This change only furthered their incentive to quickly sell the post-Spinoff Columbia Pipeline.

211. The Proxy further failed to disclose that the Executive Officer Defendants all planned to retire by July 1, 2016 – the Effective Date of the Merger – even before the Spinoff was effectuated. Specifically, the Proxy materially omitted that:

- On December 3, 2014, Matthew Gibson of Goldman Sachs reported to other Goldman team members that Defendants Skaggs and Smith were going to work for Columbia Pipeline after the Spinoff in part because "they don't want to work forever" and that Skaggs and Smith "love the business and [they] think they see [an opportunity] for a sale in the near term";

- On February 23, 2015, Rick Rivera of AYCO wrote Defendant Smith a letter confirming that Smith "put the new target [for his retirement] as early as June of 2016";

- Mr. Rivera also wrote a memorandum to file entitled "June 1, 2015, meeting memo" that Skaggs "noted that [Columbia Pipeline] could be purchased as early as Q3, 4 of 2015" and that Rivera thought "they are already working on getting themselves sold before they even split. This was the intention all along. [Skaggs] sees himself only staying on through July of 2016";

- After the Spinoff, neither Defendant Skaggs nor Smith relocated to Houston, where Columbia Pipeline was now headquartered. Instead, they temporarily moved to Columbus, Ohio, where some operational staff had an office. Defendant Skaggs rented an apartment in Ohio but bought a house in South Carolina, where he planned to retire. Skaggs and Smith never intended to move to Houston to work at Columbia Pipeline long-term;

- On December 14, 2015, Defendant Skaggs sent Defendant Cornelius, the lead director of the Board, an email with an attachment called the "CEO Succession: Proposed Plan." The email listed three different approaches to replacing him as CEO of Columbia Pipeline. All three plans assumed that he would retire on July 1, 2016, the ultimate Effective Date of the Merger;

- On December 7, 2015, in response to a message from Charles Moran, a senior Vice President of Columbia Pipeline, inviting Defendant Kettering to a management conference from April 6-8, 2016, Kettering replied "[p]ost retirement. Thanks"; and
- On March 17, 2016, the day the Merger Agreement was signed, Smith emailed Rick Rivera and asked "***do you think I can retire now***?"

212. The "Reasons for the Merger" section in the Proxy was similarly materially false and misleading because it failed to disclose that the true reason for the Merger was the Executive Officer Defendants' intent prior to the Spinoff to quickly sell Columbia Pipeline and retire after the Spinoff with enormous change-in-control benefits they would not have otherwise received without a Spinoff and merger.

## VI. LOSS CAUSATION

213. As described herein, Defendants made materially false and misleading statements and omissions of material fact in the Proxy. Defendants' materially false and misleading statements as set forth above caused Lead Plaintiff and members of the Class to accept Merger consideration that failed to adequately value Columbia Pipeline's shares. As a result of their possession of Columbia Pipeline common stock as of the Record Date and through the Effective Date of the Merger, Lead Plaintiff and Class members suffered an economic loss (*i.e.*, damages under the federal securities laws and common law).

## VII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

214. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false statements pled in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

215. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the process leading to and the reasons for the Merger. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Columbia Pipeline were not sufficient to insulate Defendants from liability for their materially false and misleading statements

216. Further, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Columbia Pipeline who knew that the statement was false when made.

## VIII. CLASS ACTION ALLEGATIONS

217. Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all Columbia Pipeline shareholders, except Defendants and their affiliates, (i) who held shares as of May 18, 2016, the Record Date for Columbia Pipeline shareholders to be eligible to vote on the merger between Columbia Pipeline and TransCanada Corporation and (ii) who held shares through the Effective Date of the Merger on July 1, 2016, and were damaged thereby (the "Class"). This action is properly maintainable as a class action for the reasons set forth below.

218. The Class is so numerous that joinder of all members is impracticable. As of the close of business on the Columbia Pipeline record date—May 18, 2016—approximately 400,401,454 shares of Columbia Pipeline common stock were outstanding and entitled to vote on the Merger. Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

219. There is a well-defined community of interests in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the Exchange Act;

(b) Whether Defendants violated Delaware common law;

(c) Whether Defendants omitted and/or misrepresented material facts;

(d) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants were negligent in making materially false and misleading statements of material facts or omissions of material facts, and/or disregarded that their statements and/or omissions were false and misleading;

(f) Whether the Executive Officer Defendants breached their fiduciary duties to Lead Plaintiff and the Class;

(g) Whether the Director Defendants breached their fiduciary duties to Lead Plaintiff and the Class;

(h) Whether Defendants' conduct caused the members of the Class to sustain damages; and

(i) The extent of damage sustained by Class members and the appropriate measure of damages.

220. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

221. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

222. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX. CLAIMS

### COUNT I

### Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants

223. Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

224. Defendants disseminated a false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, in light of the circumstances under which they were made, misstated material facts and/or omitted to state material facts necessary to make the statements therein not materially false or misleading.

225. The Proxy was prepared, reviewed, and/or disseminated by the Defendants. By virtue of their positions within Columbia Pipeline, the Defendants were aware of this information and their duty to disclose this information in the Proxy.

226. By means of the Proxy, the Defendants solicited and sought to secure Lead Plaintiffs' and other Class members' approval of the Merger with TransCanada.

227. The Defendants were at least negligent in issuing the Proxy with the materially false and misleading statements and omissions of material facts identified above. This claim does not sound in fraud.

228. The omissions and false and misleading statements in the Proxy were material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

229. The Proxy was an essential link in the accomplishment of the Merger and in causing Columbia Pipeline shareholders to vote to approve the Merger. As a result of the Proxy solicitation, Columbia Pipeline shareholders approved the Merger.

230. Lead Plaintiff and the Class were misled by Defendants' materially false and misleading statements and omissions of material facts in the Proxy, and were denied the opportunity to make a fully informed decision in voting on the Merger based upon Defendants' materially false and misleading statements and omissions of material facts.

231. By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

232. As a direct and proximate cause of Defendants' violation of Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, Lead Plaintiff and the Class have sustained damages.

233. This claim is brought within the applicable statute of limitations.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Executive Officer Defendants and Director Defendants

234. Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

235. The Executive Officer Defendants and Director Defendants (collectively, the "Control Person Defendants") acted as controlling persons of Columbia Pipeline within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions and participation in and/or awareness of Columbia Pipeline's operations and/or intimate knowledge of the false and misleading statements and omissions of material facts contained in the Proxy filed with the SEC, the Control Person Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Columbia Pipeline, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.

236. The Control Person Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Lead Plaintiff to be materially false or misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

237. In particular, each of the Control Person Defendants had direct and supervisory involvement in the day-to-day operations of Columbia Pipeline, and, therefore, are presumed to have had the power to control or influence the particular transactions and/or statements giving rise to the violations of Section 14(a) and Rule 14a-9 of the Exchange Act alleged herein, and exercised the same. The misrepresented information identified above was reviewed by the Control Person Defendants prior to voting on the Merger. The Proxy contains the unanimous recommendation of

the Director Defendants to approve the Merger. The Control Person Defendants were thus directly involved in the making and dissemination of the Proxy.

238. In addition, as the Proxy sets forth at length, and as described herein, the Control Person Defendants were involved in negotiating, reviewing, and approving the Merger Agreement with TransCanada. The Proxy purports to describe the various issues and information that the Control Person Defendants reviewed and considered. The Control Person Defendants participated in drafting and/or gave their input on the content of those descriptions in the Proxy.

239. The Control Person Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein.

240. By virtue of the foregoing, the Control Person Defendants have violated Section 20(a) of the Exchange Act.

241. As a direct and proximate cause of the Control Person Defendants' conduct in violation of Section 20(a) of the Exchange Act, Lead Plaintiff and the Class have sustained damages.

242. This claim is brought within the applicable statute of limitations.

## COUNT III

### Breach of Fiduciary Duty Against the Executive Officer Defendants and Director Defendants (In Their Capacities as Officers and Directors of the Company)

243. Lead Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

244. Defendants Skaggs, Smith, and Kettering, as officers of Columbia Pipeline, and Defendants Skaggs, Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker,

Lester P. Silverman, and Teresa A. Taylor, as directors of Columbia Pipeline, owe Lead Plaintiff and the Class the fiduciary duties of loyalty, care, and disclosure. As a result, in connection with the sale of the Company, these individuals had an obligation to maximize shareholder value. They likewise were required to refrain from benefitting themselves at the expense of Columbia Pipeline's stockholders.

245. In a breach of these duties, the Executive Officer Defendants and Director Defendants failed to safeguard the best interests of the stockholders of Columbia Pipeline by negotiating a sale of the Company through a fatally flawed process that resulted in an unfair price for Lead Plaintiff and the Class, including, *inter alia*, that:

- The Executive Officer Defendants utilized standstill provisions to eliminate TransCanada's competition in a merger transaction. This blocked Dominion, NextEra and Berkshire from participating in the merger process and gave TransCanada significant advantages in its merger negotiations with Columbia Pipeline. In doing so, the Executive Officer Defendants acted without the approval of Columbia Pipeline's Board of Directors;

- The Executive Officer Defendants also consistently allowed TransCanada to violate the TransCanada Standstill Provision to the determent of other bidders;

- The Director Defendants breached their fiduciary duties by authorizing the execution of non-disclosure agreements containing standstill provisions with Dominion, NextEra, and Berkshire. These provisions made the Director Defendants willfully ignorant of potential better acquisition offers for the Company. The Director Defendants further breached their fiduciary duties by authorizing the execution of exclusivity agreements with TransCanada rather than engaging with these and other bidders to consider their acquisition bids;

- The Executive Officer Defendants provided confidential due diligence materials to TransCanada without Board approval and in a coordinated breach of the TransCanada Standstill Provision;

- The Executive Officer Defendants repeatedly rebuffed Spectra's continual efforts to make a serious bid to acquire Columbia Pipeline despite the fact that Spectra was not a party to a standstill provision; and

- The Executive Officer Defendants warned TransCanada of merger-related tax liability to preserve its merger bid without doing so for any other entity.

246. The Executive Officer Defendants acted for their own benefit to trigger lucrative change-in-control benefits. Similarly, the Director Defendants acted for their own benefit as they received expedited vesting of their restricted stock units upon consummation of the Merger that they would not have otherwise received at that time.

247. Moreover, as detailed above, the Director Defendants were not adequately informed of all material information when the Board resolved to approve the Merger Agreement.

248. The Executive Officer Defendants and Director Defendants also breached their fiduciary duties by disseminating a Proxy that was materially false and misleading for the reasons set forth above.

249. As a direct and proximate cause of the Executive Officer Defendants and Director Defendants' breaches of their fiduciary duties, Lead Plaintiff and the Class have sustained damages.

250. As a result of the misconduct alleged herein, both before and after the Record Date, the Executive Officer Defendants and Director Defendants are liable to Lead Plaintiff and the Class for their breaches of fiduciary duties.

251. This claim is brought within the applicable statute of limitations.

## X. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment and relief as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

(c) Declaring that the Executive Officer Defendants and Director Defendants have breached their fiduciary duties to Lead Plaintiff and the Class;

(d) Awarding damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre and post-judgment interest thereon;

(e) Awarding Lead Plaintiff the costs of this action, including reasonable allowance for Lead Plaintiff's attorneys' and experts' fees; and

(f) Granting such other and further relief as this Court may deem just and proper.

## XI. JURY DEMAND

Lead Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: November 5, 2018
New York, N.Y.

Respectfully submitted,

By: */s/ Andrew J. Entwistle*

Andrew J. Entwistle
Vincent R. Cappucci
Jonathan H. Beemer
**ENTWISTLE & CAPPUCCI LLP**
299 Park Avenue, 20th Floor
New York, New York 10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
Emails: aentwistle@entwistle-law.com
vcappucci@entwistle-law.com
jbeember@entwistle-law.com

***Counsel for Lead Plaintiff The Arbitrage Fund and Lead Counsel for the Class***

David R. Scott
William C. Fredericks
**SCOTT & SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue

17th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
Emails: david.scott@scott-scott.com
wfredericks@scott-scott.com

***Additional Counsel for Lead Plaintiff***