USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 6 2019

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
IN RE COLUMBIA PIPELINE, INC.                     :        MEMORANDUM DECISION
                                                           AND ORDER
                                                  :
                                                           18 Civ. 3670 (GBD)
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

The Arbitrage Fund ("Lead Plaintiff") and Henrietta Fitkas bring this action on behalf of a class of shareholders against Defendants Columbia Pipeline Group, Inc.; Robert C. Skaggs, Jr., Columbia Pipeline's former Chairman and Chief Executive Officer; Stephen P. Smith, Columbia Pipeline's former Chief Financial Officer; Glen L. Kettering, Columbia Pipeline's former President (collectively with Skaggs and Smith, the "Executive Officer Defendants"); and Sigmund L. Cornelius, Marty R. Kittrell, W. Lee Nutter, Deborah S. Parker, Lester P. Silverman, and Teresa A. Taylor, former members of the Columbia Pipeline Board (collectively, the "Director Defendants" or the "Board"). Lead Plaintiff alleges that Defendants disseminated a false and misleading proxy statement following the March 17, 2016 merger between Columbia Pipeline and TransCanada Corporation in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a); Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; and for breach of fiduciary duties under Delaware common law. (Consolidated Am. Class Action Compl. ("Class Action Compl."), ECF No. 35.)

Defendants now move to dismiss this action pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(3), and 12(b)(6), as well as the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA"), primarily arguing that the Class Action Complaint fails to plead any material misstatements or omissions that would render the Proxy false or misleading under the

Exchange Act. (Defs.' Mot. to Dismiss Consolidated Am. Class Action Compl., ECF No. 42; *see also* Mem. of Law in Supp. of Defs.' Mot. to Dismiss Consolidated Am. Class Action Compl. ("Defs.' Mem."), ECF No. 53.) Defendants' motion to dismiss is GRANTED.

## I.   FACTUAL BACKGROUND

### A. Relevant Parties and Entities.

Henrietta Fitkas filed suit on April 25, 2018. (Compl. for Violations of the Securities Exchange Act of 1934 ("Compl."), ECF No. 1.) Fitkas previously filed a similar action in the Southern District of Texas on May 2, 2016. (*See* Defs.' Mem., Ex A (Class Action. Compl., *Ftikas v. Columbia Pipeline Grp., Inc.*, Case No. 16 Civ. 01205 (S.D. Tex.) (the "Texas Proxy Action"), ECF No. 53-1).) Shortly thereafter, Fitkas voluntarily dismissed the Texas Proxy Action without prejudice. (Notice of Dismissal, Texas Proxy Action, ECF No. 7; *see also* Order Dismissing the Action, ECF No. 8.)[1]

The Arbitrage Fund filed a motion for appointment as Lead Plaintiff in this action, arguing that it had the larger financial interest and would fairly and adequately represent the interests of the Class. (Motion of The Arbitrage Fund for Appointment as Lead Pl. and Approval of Its Selection of Lead Counsel, ECF No. 8.) Plaintiffs later stipulated to The Arbitrage Fund's designation as Lead Plaintiff, which this Court ordered. (Joint Stipulation and Order Regarding Appointment of Lead Pl. and Lead Counsel, ECF No. 25.) Lead Plaintiff subsequently filed the Consolidated Amended Class Action Complaint, purporting to bring this action by and through its attorneys on behalf of the Class. (*See* Class Action Compl. at 1.)

---

[1] For Fitkas's notice of dismissal and the corresponding order granting dismissal, refer to ECF Nos. 7 and 8 in the Southern District of Texas docket. Neither party attached these documents as exhibits in this action.

Columbia Pipeline is a Delaware corporation headquartered in Texas. (*Id.* ¶ 23.) It was originally established as a subsidiary of NiSource, which "spun off" Columbia Pipeline as its own "independent, publicly-traded company on July 1, 2015." (*Id.*) Defendant Skaggs served as CEO and President of NiSource before becoming CEO and Chairman of the Board of Columbia Pipeline." (*Id.* ¶ 24.) Defendant Smith, former CFO of Columbia Pipeline, was previously the Executive Vice President and CFO of NiSource. (*Id.* ¶ 25.) Defendant Kettering also served as Executive Vice President of NiSource before becoming President of Columbia Pipeline. (*Id.* ¶ 26.) Defendant Cornelius served on the board of directors at NiSource until the "Spinoff," at which time he became Lead Director of Columbia Pipeline. (*Id.* ¶ 28.) Defendants Kitrell, Nutter, Parker, Silverman, and Taylor also became members of the Board of Directors of Columbia Pipeline after the Spinoff. (*Id.* ¶¶ 29–34.)

Other non-party entities who played crucial roles in the events giving rise to this lawsuit include Spectra Energy Corp. ("Spectra" or "Party A"), Dominion Resources, Inc. ("Dominion" or "Party B"), NextEra Energy, Inc. ("NextEra" or "Party C"), Berkshire Hathaway Energy Company ("Berkshire" or "Party D"), and TransCanada, all of which were interested in merging with Columbia Pipeline. (*Id.* ¶¶ 38–41, 78–82, 89–94.) TransCanada successfully merged with Columbia Pipeline on March 17, 2016. (*Id.* ¶ 162.) Goldman Sachs and Lazard Freres served as financial advisors for Columbia Pipeline in connection with the Merger. (*Id.* ¶¶ 36–37.)

**B. Columbia Pipeline's Spinoff from NiSource.**

**1. The Change-in-Control Benefits.**

"NiSource is an energy company" whose "midstream natural gas business was comprised of" a number of smaller entities. (*Id.* ¶ 42.) By 2014, the NiSource subsidiaries received attention from potential buyers. (*See id.* ¶ 47.) Lead Plaintiff alleges that the Executive Officer Defendants

3

were entitled to "substantial golden parachute retirement payments" if a "change-in-control transaction" took place. (*Id.* ¶ 48.) Defined in the Executive Officer Defendants' employment agreements, a change-in-control transaction may occur only if a sale of the company encompassed "50% of the aggregate book value of NiSource Inc." (*Id.* ¶ 50 (internal quotation marks omitted).) Under those conditions, Lead Plaintiff alleges that, in lieu of retiring from NiSource, if any of the Executive Officer Defendants left NiSource to lead an entity that was spun-off from NiSource—and retired sometime thereafter—he or she would receive lucrative benefits. (*See id.* ¶ 48.) Such benefits are alleged to be:

> (i) a lump sum payment at a multiple (three times for Skaggs, and two times for Smith and Kettering) of their current base salary and target bonus; (ii) a pro rata portion of their target bonus for the year of termination; (iii) immediate vesting of previously granted stock awards and restricted stock units; and (iv) certain valuable health insurance benefits.

(*See id.*) Specifically, "Skaggs, Smith, and Kettering would have received $17.9 million, $7.5 million, and $6.1 million more in change-in-control benefits, respectively." (*Id.* ¶ 49.) Lead Plaintiff also alleges that Skaggs campaigned for Smith and Kettering to receive a "founder's grant" totaling $750,000 after the spun-off entity was formed. (*Id.* ¶ 68.) The golden parachute compensation represented "approximately 2.2% of the equity premium of the merger." (Defs.' Mem., Ex. I (Glass Lewis, 2016 Valuation of Columbia Pipeline Group Merger ("Glass Lewis"), ECF No. 53-9.)

On September 26, 2014, Columbia Pipeline was established as a new, wholly-owned subsidiary of NiSource, encompassing the "valuable midstream assets" of NiSource's pre-Spinoff subsidiaries. (Class Action Compl. ¶ 55.) The Executive Officer Defendants became executive officers of Columbia Pipeline, and they "also secured transfers of their change-in-control benefits." (*Id.* ¶¶ 64, 66.) Lead Plaintiff claims that the Executive Officer Defendants did not intend to serve

as officers for Columbia Pipeline for long, however.  (*Id.* ¶¶ 73–75.)  Instead, according to Lead Plaintiff, they intended to retire shortly after securing such transfers of their change-in-control benefits, as evidenced by, for example, Skaggs's purchase of a home in South Carolina, rather than Texas, where Columbia Pipeline was to be headquartered.  (*Id.* ¶ 75.)  In addition, Skaggs later informed some Defendants of his "CEO Succession: Proposed Plan" in 2015, and Kettering allegedly indicated his intent to retire around this time as well.  (*Id.* ¶¶ 107–08.)

### C. Pre-Merger Discussions.

#### 1.  The Bidders: Spectra, Dominion, NextEra, TransCanada, and Berkshire.

On July 7, 2015, the CEO of Spectra spoke to Skaggs about the CEO's interest in Columbia Pipeline, but he neither made a formal offer nor expressed a price per share at which he would be interested in acquiring Columbia Pipeline stock.  (*Id.* ¶ 78.)  Dominion's CEO, on the other hand, "made a verbal indication of interest in acquiring Columbia Pipeline at a price of $32.50 to $35.50 per share of Columbia Pipeline common stock" on July 20, 2015.  (*Id.* ¶¶ 79–80.)  Because of Dominion's demonstrated interest, "[o]n August 12, 2015, Columbia Pipeline and Dominion entered into a mutual non-disclosure agreement."  (*Id.* ¶ 81.)  Such agreement allowed Columbia Pipeline to disclose confidential information to Dominion for the purpose of performing due diligence on the company pre-acquisition, if any acquisition were to take place.  (*Id.* ¶¶ 81, 92.)  The agreement included a "standstill provision," which "provided that for a period of eighteen months after signing, . . . Dominion could not offer to acquire equity securities or material assets of Columbia Pipeline unless the Columbia Pipeline Board specifically requested this in writing in advance."  (*Id.* ¶ 81.)

The Columbia Pipeline Board viewed Dominion as a "serious bidder."  (*Id.* ¶ 81.)  On November 2, 2015, Skaggs met with Dominion's CEO, "who proposed . . . a joint acquisition of

Columbia Pipeline by Dominion and NextEra." (*Id.* ¶¶ 81, 91.) "Columbia Pipeline agreed to seek additional information on the propos[al]," and subsequently entered into a non-disclosure agreement with NextEra on November 12, 2015, "which allowed for the sharing of certain information with Dominion." (*Id.* ¶¶ 91–92.) NextEra's agreement also contained a standstill provision. (*Id.* ¶ 92.)

Meanwhile, on October 26, 2015, Francis Poirier, TransCanada's Senior Vice President for Strategy and Corporate Development, advised Smith that TransCanada was interested in acquiring Columbia Pipeline. (*Id.* ¶ 85.) As a result, "[o]n November 9, 2015, TransCanada and Columbia Pipeline signed a mutual non-disclosure agreement, similar to the agreement with Dominion," but which had a twelve-month standstill provision rather than eighteen. (*Id.*) TransCanada's standstill, which is functionally identical to the others, provides the following:

> Standstill. In consideration for being furnished with Evaluation Material by the other Party, each Party (each such Party in such context, the "Standstill Party") agrees that until the date that is twelve months after the date of this Agreement, unless the other Party's board of directors otherwise so specifically requests in writing in advance, the Standstill Party shall not:
>
> (A) acquire or offer to acquire, or seek, propose or agree to acquire, by means of a purchase, tender or exchange offer, business combination or in any other manner, beneficial ownership . . . of the other Party
>
> (B) seek or propose to influence, advise, change or control the management, board of directors, governing instruments or policies or affairs of the other Party, including by means of a solicitation of proxies . . . including any otherwise exempt solicitation pursuant to Rule 14a-2(b) under the Exchange Act, ***contacting any person relating to any of the matters set forth in this Agreement*** or seeking to influence, advise or direct the vote of any holder of voting securities of the other Party ***or making a request to amend or waive this provision or any other provision of this Section 3*** or
>
> (C) make any public disclosure, or take any action that could require the other Party to make any public disclosure, with respect to any of the matters that are the subject of this Agreement.

(*Id.* ¶¶ 81, 86, 92.)

Lead Plaintiff claims that representatives from Columbia Pipeline and TransCanada had interacted at least once before.  As early as May 28, 2015, Lazard Freres, financial advisor for Columbia Pipeline, reached out to TransCanada to inform it of the Spinoff, and to advise TransCanada of a potential tax liability.  (*Id.* ¶¶ 55–63.)  Under U.S. tax law, the "'Reverse Morris Trust' permits a company to effectuate a tax-free sale of a subsidiary through a spinoff and subsequent sale of the new company."  (*Id.* ¶ 56.)  An entity may incur significant tax liabilities as a result of the Reverse Morris Trust, however, if it does not properly adhere to its rules.  (*See id.* ¶ 56.)  Such "rules impose significant tax liabilities which essentially prohibit pre-spinoff suitors from acquiring a post-spinoff company for a period of two years after the spinoff."  (*Id.*)  This is because during this two-year period, it would be presumed that "any acquisition of the spun-off entity . . . [w]as a 'plan or series of related transactions' . . . designed to result in the sale of that entity.'"  (*Id.*)  Lead Plaintiff alleges that the Executive Officer Defendants warned "TransCanada about the Reverse Morris Trust risk without doing so for other potential bidders," which in turn "preserved TransCanada's ability to bid on Columbia Pipeline after the Spinoff and gave TransCanada time to construct its Merger proposal, while at the same time effectively eliminating other post-Spinoff bidders."  (*Id.* ¶ 59.)

Finally, "[o]n November 11, 2015, Goldman Sachs contacted a representative of Berkshire . . . to explore Berkshire's interest in Columbia Pipeline.  On November 17, 2015, Berkshire and Columbia Pipeline entered into a mutual non-disclosure agreement with a standstill provision," which was also identical to TransCanada's standstill language.  (*Id.* ¶ 93.)

### 2.   Invocation of the Standstills: The Equity Offering.

Lead Plaintiff alleges that, despite the other bidders, "TransCanada [] received preferential treatment."  (*Id.* ¶ 94.)  As evidence, it details an instance in which "Columbia Pipeline's Board

wanted to receive acquisition bids before a planned November 25th Board meeting[, but] Skaggs" had only informed TransCanada and Berkshire. (*Id.* ¶ 96.) Consequently, "TransCanada and Berkshire each made verbal indications of interest to Skaggs on November 24, 2015" by offering $25 to $26 per share and $23.50 per share, respectively, but TransCanada informed Skaggs that it "was 'not inclined to participate in an auction process' with other bidders.'" (*Id.* ¶ 100.) Though Skaggs considered mentioning the possibility of an exclusivity agreement to the Board, "the Board decided to terminate the sales process and proceed with an equity offering[2]" to meet Columbia Pipeline's financing requirements. (*Id.* ¶¶ 6, 102.)

Indicating "a concern about the volatility in capital markets and the possibility of missing an optimal window to do an equity financing," the Board found that a shift in focus to an equity offering from a sale was best for the corporation at that time. (*Id.* ¶ 98.) Dominion, NextEra, TransCanada, and Berkshire were advised that Columbia Pipeline "was terminating merger discussions and invoking the terms of the non-disclosure agreements. All four companies were instructed to destroy all non-public information they had about Columbia Pipeline." (*Id.* ¶ 102.) Pursuant to the standstill provisions in their non-disclosure agreements, "these companies could not try to acquire Columbia Pipeline, or even request an amendment to the standstill provision, without first receiving written permission from the Columbia Pipeline Board." (*Id.*) Lead Plaintiff alleges that Smith later indicated to Poirier over at TransCanada that Columbia Pipeline would be

---

[2] Also known as a "secondary offering," an equity offering "is the sale of new or closely held shares" after a company "has already made an initial public offering (IPO)." *Secondary Offering*, INVESTOPEDIA, https://www.investopedia.com/terms/s/secondaryoffering.asp (last visited Sept. 19, 2019). Equity offerings are thus used as a vehicle for companies "to raise additional equity capital through the creation of more shares," and may be performed when a company needs "to raise capital to finance its debt or make acquisitions[, is] interested in an offering to cash out of [its] holdings," or can be done if a company would simply like to "conduct follow-on offerings in order to raise capital to refinance debt during times of low interest rates." *Id.*

willing "to pick up the merger discussion with TransCanada again 'in a few months,'" presumably after the equity offering had concluded. (*Id.* ¶ 106.)

### 3. Post Equity Offering Negotiations Between Columbia Pipeline and TransCanada.

Lead Plaintiff principally alleges that TransCanada was given an unfair advantage over the other bidders, who were not contacted immediately after the equity offering was completed. (*Id.* ¶¶ 109–11.) It also alleges that Columbia Pipeline breached TransCanada's standstill provision on December 15, 2015, when, after the equity transaction was completed, TransCanada's Poirier offered Smith approximately $28.00 per share for Columbia Pipeline. (*Id.* ¶ 109.) Lead Plaintiff claims that, in early January of 2016, Smith sent TransCanada due diligence materials, some of which were highly confidential, and subsequently met with Poirier to discuss these materials. (*Id.* ¶¶ 110–13.) Smith also allegedly gave Poirier "guidance on how best to interact with the Columbia Pipeline Board concerning a merger." (*Id.* ¶ 114.) Lead Plaintiff asserts that the Proxy did not reveal this information, nor did it disclose that TransCanada, Dominion, NextEra, and Berkshire were restricted from merger discussions with Columbia Pipeline under the standstill provisions in their respective non-disclosure agreements. (*Id.* ¶ 117.) Lead Plaintiff further contends that the Director Defendants, with the exception of Skaggs, had no knowledge of these discussions. (*See id.* ¶ 119.)

Still, though Lead Plaintiff alleges that such communications breached the standstill in TransCanada's non-disclosure agreement, it does concede that TransCanada's Vice President did not believe this to be the case. (*See id.* ¶ 121.) Specifically, on January 23, 2016, TransCanada's VP stated that the company believed its communications with Columbia Pipeline personnel constituted "broad discussion regarding [the] valuation of [Columbia Pipeline], . . . not . . . an offer nor a proposal to acquire the securities of [Columbia Pipeline] nor constitute any other action that

would be precluded by the standstill provisions."[3]  (*Id.*)  As discussions between TransCanada and Columbia Pipeline furthered, the Board approved a request by Skaggs to provide preliminary due diligence materials to TransCanada during their January 28–29, 2016 session.  (*Id.* ¶¶ 122–24.) During this time, TransCanada's non-disclosure agreement was amended "to permit certain representatives of TransCanada access to" such materials.  (*Id.* ¶ 126.)

### 4.  TransCanada's Exclusivity Period.

On February 1, 2016, Columbia Pipeline and TransCanada entered into a 30-day exclusivity period, under which TransCanada was required to notify Columbia Pipeline if it was no longer interested in acquiring the company, and Columbia Pipeline was not allowed to "solicit bids or provide due diligence to any party that did not first provide a bona fide written unsolicited acquisition proposal." (*Id.* ¶ 128.)  The exclusivity period was later extended multiple times, with the Columbia Pipeline Board waiving TransCanada's standstill provision on March 4, 2016.  (*Id.* ¶ 135.)  Such activity was noted in the Proxy.  (*Id.*; *see also* Defs.' Mem., Ex. E (Columbia Pipeline Group, Inc. Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934), ECF No. 53-5, at 40, 43, 48–49.)  The standstill provisions for Dominion, NextEra, and Berkshire were waived on March 12, 2016.  (Class Action Compl. ¶¶ 136, 155–56, 158.)  Lead Plaintiff states that when the Board authorized the waiver of the standstill provisions for Dominion, NextEra, and Berkshire, it became aware that they "had not been legally allowed to participate in merger negotiations since November 25, 2015."  (*Id.* ¶ 159.)

After a March 10, 2016 *Wall Street Journal* article regarding merger negotiations between TransCanada and Columbia Pipeline was published, Spectra once again reached out to Columbia

---

[3] Lead Plaintiff states that this was memorialized in an email to Poirier that was intended for Skaggs, although there is allegedly no record that the email was ever sent to Columbia Pipeline.  (Class Action Compl. ¶ 121.)

Pipeline to discuss a bid. (*See id.* ¶ 143.) Columbia Pipeline responded through a representative at Goldman Sachs, indicating that it would "not respond to anything other than serious written proposals." (*Id.* ¶¶ 145, 150 (internal quotation mark omitted).) Spectra followed up, but never made a formal offer. (*See id.* ¶¶ 150–54.)

### 5. The Merger.

Negotiations with TransCanada continued. (*Id.* ¶¶ 148–49.) Then, "[o]n March 17, 2016, Columbia Pipeline entered into a definitive agreement to be acquired by TransCanada for $25.50 per share in cash. The Merger Agreement was executed less than one year after the Spinoff and . . . five days after NextEra, Dominion, and Berkshire were released from their standstill provisions." (*Id.* ¶¶ 160–62.) Lead Plaintiff states that afterward, Smith sent an email to his financial counselor asking, "[D]o you think I can retire now?" (*Id.* ¶ 164.) Lead Plaintiff also alleges that a few days after the Merger closed, the Executive Officer Defendants retired. (*Id.* ¶ 165.) It further details the Executive Officer Defendants' compensation packages upon retirement:

> Skaggs received approximately $26.84 million upon retirement—$17.9 million more than he would have received had he retired without a change-in-control transaction. Smith received $10.89 million—$7.5 million more than he would have received had he retired without a change-in-control transaction. Kettering received $8.38 million in retirement benefits—$6.1 million more than he would have received had he retired without a change-in-control transaction.

(*Id.*) The Director Defendants also received profits from the Merger. (*Id.* ¶ 166.) "Through an immediate vesting of their restricted stock units upon the change-in-control Merger, Defendant Cornelius received $363,094.50; Defendant Kittrell received $660,501; Nutter received $1,194,165; Defendant Parker received $1,184,398.50; Defendant Silverman received $131,172; and Defendant Taylor received $431,638.50." (*Id.*) Lead Plaintiff claims that their annual compensation prior to the Merger "ranged between $45,000 to $70,000 in 2015." (*Id.*)

**6.   The Alleged False and Misleading Statements in the Proxy.**

"On May 17, 2016, Columbia Pipeline filed its definitive Proxy statement, including the Merger Agreement, with the SEC." (*Id.* ¶ 167.) Lead Plaintiff alleges that the Proxy failed to disclose that Columbia Pipeline utilized standstill provisions to eliminate TransCanada's competition, (*id.* ¶¶ 169–74), omitted that TransCanada was given due diligence materials without Board approval, (*id.* ¶¶ 175–83), misrepresented the competing bidders' ability to bid on Columbia Pipeline, (*id.* ¶¶ 184–201), failed to disclose that Defendants warned TransCanada of the Reverse Morris Trust, (*id.* ¶¶ 55–63, 202–08), and failed to disclose that the Executive Officer Defendants allegedly planned the spinoff and ultimate sale of Columbia Pipeline to retire with change-in-control benefits, (*id.* ¶¶ 209–12).

## II.     LEGAL STANDARDS

### A.   12(b)(6) Motion to Dismiss Standard.

The 12(b)(6) pleading standard requires a court to accept "all factual allegations in the complaint as true and draw[] all reasonable inferences in the [P]laintiff's favor." *Testa v. Becker*, 910 F.3d 677, 682 (2d Cir. 2018). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a 12(b)(6) motion, the complaint's factual allegations must "state a claim for relief that is plausible on its face." *Testa*, 910 F.3d at 682. A court considers a number of factors in determining plausibility, including "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011). In the context of a motion to dismiss, a court must only "assess the legal feasibility of the complaint, not . . . the weight of the evidence which might be offered in support

12

thereof." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of New York,* 375 F.3d 168, 176 (2d Cir. 2004) (internal quotation mark omitted).  The court may also consider "any written instrument attached to the complaint as an exhibit, any statement or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir. 2013).

## B.  Section 14(a) of the Securities Exchange Act of 1934 and Corresponding Rule 14a-9.

"Section 14(a) of the Exchange Act bars 'the dissemination of proxy statements "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."'" *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,* 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012) (quoting *Schiller v. Tower Semiconductor, Ltd.,* 449 F.3d 286, 290 (2d Cir. 2006)); *see also* 15 U.S.C. § 78n(a).  In turn, SEC Rule 14a–9 "prohibits both the inclusion of 'any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact,' and the omission of 'any material fact necessary in order to make the statements therein not false or misleading.'" *Bricklayers,* 866 F. Supp. 2d at 238 (quoting 17 C.F.R. § 240.14a–9(a) (West 2010)).  "The SEC promulgated Rule 14a–9 'with the goal of preserving for all shareholders who are entitled to vote . . . the right to make decisions based on information that is not false or misleading.'" *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.,* 645 F. Supp. 2d 210, 225–26 (S.D.N.Y. 2009) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1197–98 (2d Cir. 1993)).

To plead a 14(a) claim, a plaintiff must adequately allege that: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiff['｣s injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was

an essential link in the accomplishment of the transaction." *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 226 (quoting *In re Marsh & McLennan Cos. Sec. Litig.*, 536 F. Supp. 2d 313, 320–21 (S.D.N.Y.2007) (internal quotation marks omitted)). A statement "is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Bricklayers*, 866 F. Supp. 2d at 238 (quoting *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002)). Likewise, an "[o]mission of information from a proxy statement will violate [Section 14(a) and Rule 14a–9] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *In re Marsh*, 536 F. Supp. 2d at 321 (quoting *Resnik*, 303 F.3d at 151) (internal quotation marks omitted). Moreover, "[t]o succeed on a material omission claim, 'the plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the *total mix* of information made available.'" *Bricklayers*, 866 F. Supp. 2d at 238 (quoting *United Paperworkers Int'l Union*, 985 F.2d at 1198) (emphasis added); *see also In re Marsh*, 536 F. Supp. 2d at 321. Important to note is that Section 14(a) does not require a plaintiff to plead "that a defendant acted with intent to defraud." *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 557 (S.D.N.Y. 2017) (citing *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 409 & n.95 (2d Cir. 2016), as amended (Apr. 29, 2016). In other words, "[a] plaintiff may state a Section 14(a) claim by pleading negligence." *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 36 F. Supp. 3d 279, 283 (S.D.N.Y. 2014), *aff'd,* 817 F.3d 393 (2d Cir. 2016) (quoting *Bricklayers*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012)).

"While '[t]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a) . . . [w]hen plaintiffs assert Section 14(a) claims

grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory.'" *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 225–26 (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005)).   The Private Securities Litigation Reform Act ("PSLRA") requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief, . . . state with particularity all facts on which that belief is formed." *Bricklayers*, 866 F. Supp. 2d at 238 (quoting 15 U.S.C.A. § 78u–4(b)(1) (West 2010) (internal quotation marks omitted).   Such heightened pleading requirement may be satisfied, therefore, if a plaintiff satisfies Federal Rule of Civil Procedure 9(b).  Fed. R. Civ. P. 9(b); *see also Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 224.  Four elements must be satisfied to meet the heightened pleading standard required under the PSLRA and Rule 9(b): the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)); *see also Kalnit v. Eichler*, 264 F.3d 131, 138–39 (2d Cir. 2001) ("A complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) . . . .  In 1995, Congress enacted the . . . PSLRA . . . which, among other things, imposed heightened pleading requirements for plaintiffs in securities fraud actions.").

The statute of limitations on a section 14(a) claim begins to run "one year after discovery of the facts giving rise to the claim." *Dekalb Cty. Pension Fund*, 36 F. Supp. 3d at 281.

### C.  Section 20(a) of the Securities Exchange Act of 1934

Regularly referred to as "control person liability," a Section 20(a) claim is properly pled when a plaintiff alleges "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007)).   A control person liability claim may be summarily dismissed, however, if a court finds that a plaintiff's Section 14(a) claim warrants dismissal.  *See, e.g.*, *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 n.2 (2d Cir.1993) ("Because Section 20 merely creates a derivative liability for violations of other sections of the Act, claims under Section 20 are governed by the limitations periods for those other sections."); *Dekalb Cty. Pension Fund*, 36 F. Supp. 3d at 286 (same); *Tiberius Capital, LLC v. PetroSearch Energy Corp.*, No. 09 Civ. 10270 (GBD), 2011 WL 1334839, at *8 (S.D.N.Y. Mar. 31, 2011), *aff'd*, 485 F. App'x 490 (2d Cir. 2012) ("Having failed to allege an underlying securities violation by [the defendant] pursuant to . . . Section 14(a) and Rule 14a–9, Plaintiff[']s control liability claim is defective.   Accordingly, Plaintiff has failed to state a claim under Section 20(a).").

### III.    THE DISCOVERY RULE

As stated above, the statute of limitations on a section 14(a) claim begins to run "one year after *discovery* of the facts giving rise to the claim." *Dekalb Cty. Pension Fund*, 36 F. Supp. 3d at 281 (emphasis added).  Discovery "includes constructive, . . . inquiry notice[, and] actual notice[, and t]he statute of limitations may be triggered *when,* after obtaining inquiry notice . . . the [plaintiffs], in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 174 (S.D.N.Y. 2003)

(quoting *Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir. 2000) (internal quotation mark omitted)). "To trigger the underlying duty to inquire . . . defendant[s] must establish that plaintiff[s] acquired information that suggested the *probability* and not mere *possibility* that fraud had occurred." *Id.* (alteration in original) (quoting *Lenz v. Associated Inns and Restaurants Co. of America,* 833 F. Supp. 362, 371 (S.D.N.Y. 1993) (internal quotation marks omitted).

Defendants argue that Lead Plaintiff should have brought this suit on or before April 24, 2017. (Defs.' Mem. at 25.)  They contend that "[a] reasonably diligent plaintiff would have discovered the facts underlying the alleged violations at issue in the [c]omplaint long before[this date]," citing a number of cases that suggest that "an abundance of publicly available information," including news articles, would alert the reasonably prudent plaintiff to a potential claim. (*Id.* at 25–26 (citing *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, 2013 WL 620257, at \*11 (S.D.N.Y. Feb. 15, 2013), *aff'd* 607 Fed. App'x 79 (2d Cir. 2015)); *Pa. Pub. Sch. Emps. Ret. Sys.*, 874 F. Supp. 2d at 365–66.

Plaintiff Henrietta Fitkas has already demonstrated her direct knowledge of the facts giving rise to this litigation when, on May 2, 2016, she filed a complaint in the Southern District of Texas alleging many of the same violations alleged herein. (*See id.* at 26; *see also id.*, Ex. A (Texas Proxy Action), ¶ 1 (similarly bringing suit against Columbia Pipeline, the Executive Officer Defendants, and the Director Defendants for their alleged violations of Sections 14(a) and 20(a), arising out of the TransCanada acquisition). In fact, much of the factual allegations there resemble those raised here: Fitkas alleged, *inter alia*, that the Defendants gave TransCanada an unfair tactical advantage in placing "a strict no-solicitation provision" that prevented Columbia Pipeline from soliciting other potential bidders, (Texas Proxy Action ¶¶ 7, 66–67); similarly detailed Columbia Pipeline's discussions with Spectra (Party A), Dominion (Party B), NextEra (Party C),

Berkshire (Party D), and TransCanada, with particular emphasis on TransCanada's alleged favoritism during such discussions, (*id.* ¶¶ 30–58); principally alleged that the Board failed to disclose its preference for TransCanada in the Proxy, (*id.* ¶¶ 71–74); and, finally, claimed that Defendants knowingly and recklessly breached "their fiduciary duties of loyalty, good faith, and independence," (*id.* ¶ 104). Therefore, Fitkas discovered the facts underlying this lawsuit by May 2, 2016, less than two months after the March 17, 2016 Merger Agreement was signed, when she filed suit detailing Defendants' alleged wrongdoings.

Moreover, other plaintiffs purporting to represent the Class filed a lawsuit shortly thereafter in the Delaware Chancery Court on October 6, 2016. (*See* Defs.' Mem., Ex. B (Second Am. Verified Class Action Compl., *In re Columbia Pipeline Grp., Inc. S'holder Litig.*, Case No. 12152-VCL (Del. Ch.)) (the "First Delaware Fiduciary Action"), ECF No. 53-2; *see also* Ex. C (Order Granting Mot. to Dismiss, First Delaware Fiduciary Action), ECF No. 53-3.) It thus follows that the First Delaware Fiduciary Action, also filed in 2016, placed Lead Plaintiff on notice of the facts giving rise to this complaint.

Finally, beyond the Plaintiffs' demonstrated direct knowledge of the facts giving rise to this lawsuit and the corresponding First Delaware Fiduciary Action, Defendants provide a number of news articles and SEC filings that *should have* put Lead Plaintiff on notice of its potential claims. (Defs.' Mem., Ex. H (Moody's Investors Service, Columbia Pipeline Group, Inc.: No Immediate Rating Impact from Proposed Acquisition by TransCanada, Mar. 18, 2016), ECF No. 53-8; Ex. I (Glass Lewis) (recommending that the shareholders vote in favor of the proposed merger and golden parachute compensation); Ex. J (ISS Proxy Analysis & Benchmark Policy Voting Recommendations for Columbia Pipeline Group, Inc., 2016) (finding that support for the merger was warranted "in light of the market's positive reaction, the meaningful premium, and the

18

strategic rationale," and also providing that the golden parachute payments were "reasonable relative to the" approximately $10.2 billion transaction equity value), ECF No. 53-10; Ex. K (June 22, 2016 Columbia Pipeline Group, Inc. Form 8-K), ECF No. 53-11; Ex. L (News Release, TransCanada Acquisition of Columbia Pipeline Group Receives Stockholder Support: TransCanada Advances Vision to Create North America's Leading Natural Gas Transportation and Storage Company, June 22, 2016), ECF No. 53-12; Ex. M (Columbia Pipeline Group, Inc. Amendment No. 5 to Form 10), ECF No. 53-13).)

Lead Plaintiff counters by stating that "[t]he Proxy's material omissions were revealed no earlier than March 28, 2018, when internal [Columbia Pipeline] documents and testimony were disclosed in the Delaware Appraisal Action. . . . Neither the Proxy nor the Fitkas Action and First Delaware Fiduciary Action pled or revealed the actionable omissions detailed in Lead Plaintiff's Complaint." (Lead Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl. ("Opp'n"), ECF No. 49, at 4; *see also In re Appraisal of Columbia Pipeline Grp., Inc.*, Case No. 12736-VCL (Del. Ch.) (the "Appraisal Action").) Delaware General Corporations Law Section 262 grants a company's stockholders the right to commence a judicial "appraisal proceeding" to determine the fair stock price. Del. Gen. Corp. Law § 262(e). In determining fair value, the appraisal court takes into account "all relevant factors." *Id.* § 262(h). Lead Plaintiff argues that only after the Appraisal Action did Plaintiffs discover:

> (i) the existence and specific terms of the preclusive Standstills (¶¶ 81, 85–88, 92–93); (ii) that Defendants used these Standstills starting in November 2015 to prohibit Dominion, NextEra, and Berkshire from bidding on [Columbia Pipeline] (¶¶ 102, 125, 185–86); (iii) that Smith notified TransCanada "[t]hey've eliminated the competition," and provided it (and no other bidder) with the highly confidential [Columbia Pipeline] Due Diligence Materials in early January 2016 (¶¶ 110–19, 123–24, 175–83); (iv) that Defendants affirmatively rejected Spectra's urgent requests for meetings and due diligence in March 2016 (¶¶ 144–53); (v) that the Executive Officer Defendants conspired to increase their change-in-control benefits and rushed to sell [Columbia Pipeline] by July 1, 2016 (¶¶ 53–54, 67–70, 75, 107–

08, 164); and (vi) [Columbia Pipeline] specifically warned TransCanada not to initiate pre-Spinoff merger negotiations in order to avoid Reverse Morris Trust tax liability (¶¶ 58–62).

(Opp'n at 25–28.)  Lead Plaintiff claims that it "could not have adequately pled a Section 14(a) claim based on such omissions until those facts were revealed in the Appraisal Action on March 28, 2018 and thereafter."  (*Id.* at 26.)

In effect, Lead Plaintiff attempts to argue that three separate actions, one of which involved a trial to determine the fair value of Columbia Pipeline stock, was required before pleading the operative complaint.  Using such logic to toll a statute of limitations is dangerous, however, as it would essentially allow a plaintiff to toll a limitations period almost indefinitely: a plaintiff need only argue that it discovered additional facts during discovery in a prior action that made it better equipped to draft a more detailed complaint.  Though Federal Rule of Civil Procedure 8(a) only requires a plaintiff to plead "a short and plain statement of the claim showing that [it] is entitled to relief," Fed. R. Civ. P. 8(a)(2), a plaintiff tasked with satisfying the heightened 9(b) standard would find such a tactic desirable.

More importantly, this action seems to be the Class's fourth bite of the apple.  It is true that Columbia Pipeline's "Restated Certificate of Incorporation . . . provides that the Delaware Chancery Court is the exclusive forum for breach of fiduciary duty claims," explaining why the First Delaware Fiduciary Action was brought in Delaware, separate and apart from the Texas Proxy Action brought in the Southern District of Texas.  (Defs.' Mem. at 28 (citing Ex. S (Restated Certification of Incorporation of Columbia Pipeline Group, Inc., June 30, 2015), ECF No. 53-19, § 9.1 ("[T]he Court of Chancery of the State of Delaware . . . shall be the sole and exclusive forum for . . . any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders.")).)  Still,

since then, other plaintiffs purporting to represent the Class have brought the Appraisal Action, this action, and a second Delaware fiduciary action, the latter of which was filed on July 3, 2018. (*See* Defs.' Mem., Ex. D (Verified Stockholder Class Action Compl., *Pub. Emps. Ret. Sys. of Miss. v. Skaggs*, Case No. 2018-0484 (Del. Ch.)) (the "Second Delaware Fiduciary Action"), ECF No. 53-4.)

A similar attempt was denied by Judge Milton Pollack in *In re Merrill Lynch & Co., Inc.* In that case, Judge Pollack found that "plaintiffs, and indeed the whole investment community, were on inquiry notice of the asserted 'fraud' well more than one year prior to the filing of the complaints . . . which invoked the one-year statute of limitations terminating these suits." *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 389 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). Judge Pollack clarified that he was not required to "consider . . . whether [the plaintiffs] were given inadequate information about the alleged . . . fraud but whether [p]laintiffs '*had constructive notice of facts sufficient to create a duty to inquire further into that matter*." *Id.* (emphasis added).

What distinguishes this case from *In re Merrill Lynch & Co., Inc.*, however, is that, in that case, "the dramatic decline in the price of [the p]laintiffs' shares . . . served to put them on notice of the alleged fraud," Judge Pollack previously gave the plaintiffs the opportunity to amend their complaints, and plaintiffs were even "advised by the [c]ourt, prior to amending their complaints, of certain pleading deficiencies and what the [c]ourt would require." *Id.* at 389–90. It is not clear here whether the information that Plaintiffs discovered through the Appraisal Action—namely, the existence of the standstills, when they were invoked, and the sensitive email communications that were exchanged—would have been as immediately discernible after the Proxy was filed and press releases on the matter published. States of mind pled herein regarding the Executive Officer

Defendants' intent to retire might not have been ascertained, and private discussions may have remained uncovered.

As a result, in an abundance of caution, this Court will address whether the Defendants' conduct violated Section 14(a) of the Exchange Act. Nevertheless, Lead Plaintiff's use of the Appraisal Action to support its timeliness argument cuts both ways: Judge J. Travis Laster has recently issued a Memorandum Opinion following trial, providing that "[t]he fair value of Columbia[ Pipeline's] stock at the effective date was $25.50 per share," the agreed upon amount between Columbia Pipeline and TransCanada. (Lead Pl.'s Letter dated Aug. 13, 2019, Ex. A (Mem. Opinion re Appraisal Action (the "Appraisal Action Decision")), ECF No. 56-1, at 111.) It is Lead Plaintiff who brought this decision to this Court's attention. (*See* Lead Pl.'s Letter dated Aug. 13, 2019, ECF No. 56.) Accordingly, in addressing Lead Plaintiff's allegations about those facts that were uncovered in the Appraisal Action, this Court will refer to Judge Laster's extensive opinion—incorporated by reference—which detailed evidence uncovered at trial relating to Lead Plaintiff's allegations. *See In re Thelen LLP,* 736 F.3d at 219 (stating that a court may consider "any written instrument attached to the complaint as an exhibit, any statement or documents incorporated in it by reference, and any document upon which the complaint heavily relies").

## IV.   DEFENDANTS' MOTION TO DISMISS THE COMPLAINT UNDER SECTION 14(A) AND RULE 14-A9 IS GRANTED.

### A. Lead Plaintiff Fails to Adequately Plead that the Director Defendants Violated Section 14(a).

The Class Action Complaint fails to address any conduct on the part of the Director Defendants that amounts to a violation of Section 14(a) of the Exchange Act.[4] Lead Plaintiff alleges that the Director Defendants were aware of the Executive Officer Defendants' alleged

---

[4] This portion of the opinion does not pertain to Skaggs, whose alleged misconduct will be discussed along with that of the Executive Officer Defendants *infra.*

misconduct in facilitating the Merger, including their favoritism of TransCanada, and their intent to retire immediately thereafter. (*See, e.g.*, Class Action Compl. ¶¶ 107, 135–42, 159.) It also criticizes the Board's tacit approval of the Executive Officer Defendants' negotiations with TransCanada. (*Id.* ¶¶ 109–62.)

Such allegations, however, are inconsistent with others made in the complaint, which paint the Director Defendants as parties that were kept in the dark as the Executive Officer Defendants secretly finessed the Merger process to feed their own agenda. For example, Lead Plaintiff alleges that the Executive Officer Defendants were "acting without Board approval" in carrying out much of the alleged misconduct giving rise to this litigation. (*Id.* ¶ 116; *see also* Opp'n at 1, 3, 6–8, 11, 14–15, 17, 18 n.8, 26.) It further alleges that "[t]he Columbia Pipeline Board did not approve the granting of the Company's confidential business materials to TransCanada until late January 2016," which was "monumentally significant given that the Board had not yet decided that the Company should even be sold," (Class Action Compl. ¶¶ 118–19), and that "[t]he Columbia Pipeline Board did not approve the provision of the Company's confidential business materials to TransCanada until late January 2016," (*id.* ¶¶ 123–24).

Lead Plaintiff thus attempts to tell two stories: one in which *all* Defendants acted unlawfully in furnishing a false and misleading proxy statement, and another in which the Executive Officer Defendants unlawfully withheld information from the Director Defendants, such that the second set could not have known that the Proxy was false and misleading. Such allegations appear oxymoronic, and do not suffice to establish a claim under Section 14(a). As stated above, "[w]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements,'" *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 225–26, which may only be satisfied if a plaintiff states "with

particularity the circumstances constituting fraud," *see* Fed. R. Civ. P. 9(b) (internal quotation marks omitted). Lead Plaintiff's inconsistent claims thus do not sufficiently demonstrate fraud on behalf of the Director Defendants.

To be sure, the complaint provides some detail concerning the Director Defendants in an attempt to satisfy the heightened 9(b) standard; still, even these allegations fail to demonstrate that the Director Defendants played a pivotal role in the events leading to the furnishing of the alleged false and misleading Proxy Statement that would violate Section 14(a). For example, Lead Plaintiff alleges that the Director Defendants may have been aware of Skaggs's intent to retire because of his CEO Succession Plan, which was given to them in or around December 2015 through January 2016, and about which they subsequently met. (*See* Class Action Compl. ¶ 107.) Lead Plaintiff also claims that the Director Defendants became aware that the other bidders were subject to standstill provisions during negotiations with TransCanada because such standstills were waived by the Board on March 12, 2016, days before the Merger Agreement was signed. (*Id.* ¶¶ 135–36.) In addition, when Spectra reached out to Columbia Pipeline after the *Washington Post* article was published detailing the conversations with TransCanada, Lead Plaintiff alleges that the Board informed "TransCanada that they had received an inquiry from a 'credible, large, midstream player'" and "asked for TransCanada's input on Columbia Pipeline's scripted response to the Spectra inquiry and to any future inquiries that might be received from other bidders." (*Id.* ¶ 148.) Finally, "[t]he Proxy stated that it was issued 'by order of the Board of Directors' of Columbia Pipeline and 'as part of the solicitation of proxies by the Board' of Columbia Pipeline." (*Id.* ¶ 167.)

Even if the Board were aware of Skaggs's Succession Plan, this does not mean that the Board would have been aware of some greater plan by Skaggs and the other Executive Officer

Defendants to cash in on change-in-control benefits upon the sale of Columbia Pipeline. Lead Plaintiff's allegations are not minor: the Class Action Complaint essentially alleges that the Executive Officer Defendants, knowing that their employment agreements contained a clause regarding change-in-control benefits, hatched a plan to spin off NiSource into a separate entity comprised of its subsidiaries, become executive officers of this new entity, and use their power and authority as officers to quickly and unethically negotiate a sale. Such conduct cannot be readily discernible from Skaggs's CEO Succession Plan. Indeed, if the Plan even intimated such, Lead Plaintiff should have and likely would have pled it.

The same can be said of the allegations regarding the standstill provisions to which the other bidders were subject. Even if the Director Defendants became aware of such provisions from November 25, 2015, when "the Board decided to terminate the sales process and proceed with the equity offering," until March 12, 2016, days before the Merger, this does not also mean that they were aware of some hidden agenda by the Executive Officer Defendants to keep the standstills in place to effectively grant TransCanada exclusivity throughout the entire negotiation process, or to engage in some cover-up shortly thereafter. (*Id.* ¶ 102.)[5]

With regard to the Board reaching out to TransCanada on March 12, 2016 about how best to respond to Spectra's inquiry, Lead Plaintiff claims that "Smith purportedly asked for TransCanada's input in order to ensure that Columbia Pipeline was not in violation of the TransCanada exclusivity agreement[, even though] the two companies were not currently bound by any such agreement" at that time. (*Id.* ¶ 148.) Still, this interaction does not evince that the Board had knowledge, or even *should have had* knowledge, of the Executive Officer Defendants' alleged underlying wrongdoing because the Merger Agreement was signed soon after this date.

---

[5] A more detailed discussion of the omission of the standstills from the Proxy is discussed *infra*, at Section VI.B.

(*Id.* ¶ 162.)  It is equally likely that Columbia Pipeline and TransCanada were close to closing the deal and, to avoid any appearance of impropriety—especially after their discussions had been made public, (*id.* ¶ 148)—the Board sought TransCanada's advice on how best to move forward. Indeed, in the Appraisal Action Decision, Judge Laster noted, "[t]he Board determined that there was a serious risk that TransCanada would withdraw its offer if Columbia delayed signing to buy time for Spectra.  The Board also determined that Spectra was unlikely to make a competitive offer, if it made one at all."  (Appraisal Action Decision at 26.)  Judge Laster noted that even though the Board incorrectly believed that its exclusivity period with TransCanada had been renewed, this "would not have changed how they proceeded" because, at that time, the Board was "worried about losing the TransCanada offer."  (*Id.* at 26–27 n.22.)  In any event, Lead Plaintiff's failure to sufficiently allege the Director Defendants' participation in the alleged fraud under Rule 9(b) precludes any conclusion that they violated Section 14(a).

Nor does the fact that the Director Defendants signed the Proxy support the finding that they violated Section 14(a), because this was not "an essential link in the accomplishment of the transaction."  *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 226.  In *Police & Fire Retirement Systems of City of Detroit*, Judge Paul A. Crotty dismissed the plaintiff's 14(a) claims against the director defendants because they seemed to be included "for no reason other than their signature on [the] proxies."  *Id.* at 239.  Judge Crotty noted that because the plaintiffs' section 14(a) claims were based in fraud, the plaintiffs were required to satisfy the heightened pleading standard of Rule 9(b).  *See id.*  He found that the plaintiffs failed "to meet that standard by simply alleging that the Corporate Director Defendants had the requisite state of mind because they signed certain documents or because of their positions, rather than alleging with more specificity their knowledge of the allegedly fraudulent stock-options accounting."  *Id.* (collecting cases).

The same can be said here.  Lead Plaintiff does not allege that the Director Defendants played a role in the alleged conduct giving rise to this litigation, and certainly does not provide the level of detail that it does in describing the Executive Officer Defendants' conduct.  Instead of arguing that the Director Defendants played a part in the Executive Officer Defendants' scheme, Lead Plaintiff passively asserts that they should have known about this scheme.  (Class Action Compl. ¶¶ 107–08, 135–36, 167.)  Instead of pleading with specificity any conduct by the Board that may establish their desire to endorse the Executive Officer Defendants' conduct—or to feed their own agenda—Lead Plaintiff pleads facts that do not themselves lead one to believe that the Director Defendants acted wrongfully, or that their conduct contributed to any false or misleading proxy.  Although the complaint provides that, like the Executive Officer Defendants, the Director Defendants "accumulated substantial amounts of restricted stock units that would immediately vest upon a change-in-control at NiSource[, and] acted to ensure their change-in-control benefits were transferred with them when they moved from NiSource to Columbia Pipeline," (*id.* ¶ 71), it fails to similarly allege how the Director Defendants misused their status and position to receive such benefits.

Ultimately, there were many instances of alleged misconduct in the complaint which failed to implicate the Director Defendants.  The Rule 9(b) standard does not apply selectively: it applies to each alleged wrongdoer, and all alleged instances in the complaint.  *See DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform [each defendant] of the nature of his alleged participation in the fraud.").  Because Lead Plaintiff fails to state with specificity the conduct that contributed to the Director Defendants' Section 14(a) violation, these allegations are dismissed.

27

**B. Lead Plaintiff Fails to Sufficiently Allege that the Executive Officer Defendants Violated Section 14(a).**

The conduct of the Executive Officer Defendants, and mainly Skaggs, is at the crux of this litigation. The principal allegations, as stated *supra*, are as follows: the Proxy failed to disclose that Columbia Pipeline utilized standstill provisions to eliminate TransCanada's competition, (Class Action Compl. ¶¶ 169–74), omitted that TransCanada was given due diligence materials without Board approval, (*id.* ¶¶ 175–83), misrepresented the competing bidders' ability to bid on Columbia Pipeline, (*id.* ¶¶ 184–201), failed to disclose that Defendants warned TransCanada of the Reverse Morris Trust, (*id.* ¶¶ 202–08), and failed to disclose that the Executive Officer Defendants allegedly planned the spinoff and ultimate sale of Columbia Pipeline to retire with change-in-control benefits, (*id.* ¶¶ 209–12).

**1. The Standstills and the Competing Bidders' Ability to Bid on Columbia Pipeline.**

As to the standstills, Defendants argue that the Proxy disclosed that Columbia Pipeline "entered into non-disclosure agreements with Dominion, NextEra, and Berskhire." (Defs.' Mem. at 18 (citing Proxy at 35, 37.) They also claim "[i]t is well known that standstills are 'customar[y] in non-disclosure agreements." (*Id.* (quoting Christina M. Sautter, *Promises Made To Be Broken? Standstill Agreements in Change of Control Transactions*, 37 DEL. J. CORP. L. 929, 931 (2013); Sautter, *supra* at 943, 945 (explaining that "the overwhelming majority" of targets "choose to execute a confidentiality agreement including a standstill provision," and that standstills are "de regueur"); Business Law Center, *Survey: Transactional NDA Terms* (Oct. 25, 2018) (finding that 80% of surveyed non-disclosure agreements contained standstills).) Therefore, Defendants argue that "[t]he Proxy was not required to describe in detail 'customary' terms in the non-disclosure agreements." (*Id.*)

Lead Plaintiff, on the other hand, argues that omitting the existence of the standstills "was material because the Proxy portrayed these companies as viable bidders that chose not to pursue negotiations with [Columbia Pipeline] after November 2015." (Opp'n at 14; Defs.' Mem., Ex. G (Proxy), at 39.)  Moreover, Plaintiff claims that "[c]ontrary to Defendants' assertion, the Proxy's mere indication that no bidder was subject to a [s]tandstill *after* execution of the Merger Agreement, in no way disclosed the existence of the [s]tandstills in the *pre-signing* period." (Opp'n at 15; Defs.' Mem., Ex. G (Proxy), at 55 ("[N]one of Party A, Party B, Party C or Party D would be subject to standstill obligations that would prohibit them from making an unsolicited proposal to the Board following announcement of entry into the merger agreement with TransCanada").)

Absent here is any indication that the standstills actually impeded the competing bidders' ability to bid on Columbia Pipeline, which could have made such exclusion material.  Judge Laster came to this same conclusion when rendering the Appraisal Action Decision, finding that "[t]he evidence does not show that the standstills undermined the fairness of the deal price.  None of the standstill parties wanted to bid, and they in fact did not bid."  (Appraisal Action Decision at 67.) To determine the materiality of the standstills, if any, it would be helpful to analyze the negotiation process between all parties.

Spectra, who was never subject to a non-disclosure agreement, never made a serious bid. As indicated above, the CEO of Spectra spoke to Skaggs about his interest in Columbia Pipeline on July 7, 2015, but did not make a formal offer and he did not express a price per share at which he would be interested in acquiring Columbia Pipeline stock.   (Class Action Compl. ¶ 78.) Dominion's CEO, on the other hand, offered to acquire Columbia Pipeline at a price per share of $32.50 to $35.50 on July 20, 2015, and, "[o]n August 12, 2015, Columbia Pipeline and Dominion

entered into a mutual non-disclosure agreement." (*Id.* ¶¶ 79–81.)   Skaggs later met with Dominion's CEO on November 2, 2015, "who proposed . . . a joint acquisition of Columbia Pipeline by Dominion and NextEra," after which Columbia Pipeline entered into a non-disclosure agreement with NextEra on November 12, 2015. (*Id.* ¶¶ 81, 91–92.)

TransCanada's Poirier advised Smith that TransCanada was interested in acquiring Columbia Pipeline on October 26, 2015, so "[o]n November 9, 2015, TransCanada and Columbia Pipeline signed a mutual non-disclosure agreement." (*Id.* ¶ 85.)   Finally, "[o]n November 11, 2015, Goldman Sachs contacted a representative of Berkshire . . . to explore Berkshire's interest in Columbia Pipeline.   On November 17, 2015, Berkshire and Columbia Pipeline entered into a mutual non-disclosure agreement with a standstill provision," which was also identical to TransCanada's standstill language. (*Id.* ¶ 93.)

Lead Plaintiff later provides that TransCanada and Berkshire were the only bidders to receive notice of the Board's November 25, 2015 deadline for acquisition bids, so on November 24, 2015, they offered $25 to $26 per share and $23.50 per share, respectively.  (*See id.* ¶ 100.) On November 25, however, the Board decided that it would rather proceed with an equity offering, so it decided to terminate merger discussions and invoke the standstills for *all* bidders. (*See id.* ¶ 102.)   The equity offering concluded on or around December 15, 2015, when Lead Plaintiff indicated that TransCanada's Poirier offered Smith approximately $28.00 per share for Columbia Pipeline. (*Id.* ¶ 109.)

All parties were placed on notice that the equity offering had ended.   Defendants provide an example of a Columbia Pipeline press release publicizing the commencement of the equity offering in their papers, (Defs.' Mem., Ex. G (News Release, Columbia Pipeline Group Announces Closing of Equity Offering: Proceeds Provide CPG Greater Financial Flexibility and Funds

Growth Strategy, Dec. 7, 2015), ECF No. 53-7), and a quick online search reveals a number of articles discussing the end of the equity offering as well, *see Columbia Pipeline Group Announces Closing of Equity Offering: Proceeds Provide CPG Greater Financial Flexibility and Funds Growth Strategy*, CISION PR NEWSWIRE (Dec. 7, 2015), https://www.prnewswire.com/news-releases/columbia-pipeline-group-announces-closing-of-equity-offering-300188838.html (last visited Sept. 19, 2019) ("Columbia Pipeline Group, Inc. (NYSE: CPGX) ('CPG') today announced the closing of its public offering of 71.5 million shares of common stock at a public offering price of $17.50 per share."); *Columbia Pipeline Group Announces Closing of Equity Offering*, OIL & GAS 360 BY ENERCOM (Dec. 8, 2015) (last visited Sept. 19, 2019) (same). As previous contenders for the acquisition of Columbia Pipeline stock, Dominion, NextEra, and Berkshire were likely aware of when the equity offering commenced and could have inquired about Columbia Pipeline's next steps. Such inquiry would not have been in contravention of the standstills, which specifically forbade the bidders from acquiring or offering "to acquire, or seek, propose or agree to acquire, by means of a purchase, tender or exchange offer, business combination or in any other manner, beneficial ownership . . . of" Columbia Pipeline, or contacting anyone about matters in the agreement specifically, without first receiving a written request from the corporation. (Class Action Compl. ¶ 102 ("[T]hese companies could not try to acquire Columbia Pipeline, or even request an amendment to the standstill provision, without first receiving written permission from the Columbia Pipeline Board.").) The only corporation that reached out after the equity offering was TransCanada, though such communication likely did breach its standstill. Thus, this Court agrees with Judge Laster, and finds that because "none of the standstill parties wanted to bid, and . . . in fact did not bid," (Appraisal Action Decision at 67), a reasonable shareholder would likely not find material the Defendants' failure to include the existence of the standstills in the Proxy.

A similar conclusion was reached by the Second Circuit in *Kalnit v. Elcher*. In that case, the defendant filed a proxy statement under Section 14(a) of the Exchange Act. 264 F.3d 131, 136 (2d Cir. 2001). A class of plaintiffs later challenged the proxy "under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), alleging," *inter alia*, "that defendants fraudulently failed to disclose . . . the board's decision to release" a bidder from its standstill restriction. *Id.* at 137. The panel found that the non-disclosure allegations did not rise to the level of recklessness because the case did "not present facts indicating a clear duty to disclose." *Id.* at 144. The panel reasoned that the allegations in that case concerned the corporation's "failure to disclose its waiver of a then three[-]year[-]old standstill provision. The recklessness of this behavior is not apparent from the facts alleged by plaintiff. We therefore conclude that plaintiff's allegations are inadequate to demonstrate strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *Id.*

Though *Kalnit* is distinguishable from this case in that it deals with a Rule 10(b) violation, it is factually analogous because here, Lead Plaintiff's allegations sound in fraud. Lead Plaintiff asserts that the Executive Officer Defendants attempted to deceive and ultimately defraud the shareholders by furnishing a false and misleading proxy that omitted their intent to quickly retire with millions of dollars in lucrative benefits, and thereafter attempted to conceal their rush to judgment in selecting a bidder rather than acting in the best interest of the shareholders. In so doing, they either strategically required that the potential bidders sign standstills to continue their improper merger negotiations with TransCanada while the others were left in the dark, or they concealed that the other bidders were restricted from negotiating after the fact. Such allegations of fraud are subject to a heightened pleading standard, *Police & Fire Ret. Sys. of City of Detroit*, 645 F. Supp. 2d at 225–26, which may be proven by satisfying the PSLRA or Rule 9(b),

*Bricklayers*, 866 F. Supp. 2d at 238; Fed. R. Civ. P. 9(b).  Such are the standards that the Second Circuit articulated before rendering its decision in *Kalnit*.  264 F.3d at 138 (2d Cir. 2001) ("A complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) . . . .  In 1995, Congress enacted the . . . PSLRA . . . which, among other things, imposed heightened pleading requirements for plaintiffs in securities fraud actions.")

Accordingly, as in *Kalnit*, because Lead Plaintiff fails to assert that the Executive Officer Defendants' failure to disclose the existence of the standstills was conscious, reckless, or at a bare minimum, had any bearing on the other bidders' ability to bid, a reasonable shareholder would likely not find this omission material.[6]  Moreover, as will be discussed *infra*, the existence of the standstills during TransCanada's continued discussions with Columbia Pipeline did not alter the total mix of information readily available.

### 2.  The Executive Officer Defendants' Alleged Preference for TransCanada.

At the center of Lead Plaintiff's claims against the Executive Officer Defendants is their preference for TransCanada that seemed to facilitate much of the misconduct alleged.  (*See, e.g.*, Opp'n at 17–18.)  It bears mentioning that a preference for one bidder over another does not amount to a Section 14(a) violation.  Indeed, as negotiations move forward, one bidder may stand out amongst the rest, and a company may find that a merger with, or acquisition by, that company is most desirable.  An objection to the negotiation process, moreover, sounds in breach of fiduciary duty, which is not redressable under Section 14(a).  *See Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999) (affirming a district court's dismissal of claims regarding potential conflicts of interest which were "no more than state law breach of fiduciary duty claims under a thin coat of

---

[6] Lead Plaintiff's claims regarding the Executive Officer Defendants' failure to disclose the "fiduciary out" provision fails for substantially the same reasons. (*See* Class Action Compl. ¶¶ 185, 187; Opp'n at 16–17.)

federal paint"). This Circuit has "long recognized that no general cause of action lies under [Section] 14(a) to remedy a simple breach of fiduciary duty." *Id.* (collecting cases). Indeed, at oral argument, in response to Lead Plaintiff's argument that Defendants should have disclosed the fact that TransCanada was given preferential treatment, this Court stated:

> They don't have an obligation to put in the Proxy Statement TransCanada is being given preferential treatment. That's not a legitimate disclosure. . . . That is self-flagellation. That's a characterization; that's not a fact. . . . [T]he amorphous . . . "they should have said that they were really giving them an advantage in trying to advance their own interests," I agree that that's not a legitimate disclosure.

(Tr. of Oral Argument dated Mar. 28, 2019, at 61:5–16.) The failed disclosure of a conflict of interest, on the other hand, may be redressable, and is adequately pled if there was not a "full disclosure of potential conflicts" because such omission would deprive the "shareholders of the opportunity to judge for themselves what significance to attribute to the proxy's representations of the competing bidders." *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 994 (2d Cir. 1988) (citing *Kas v. Fin. Gen. Bankshares*, 796 F.2d 508, 513 (D.C. Cir. 1986).

The operative complaint in this case fails to allege any conflicts. In alleging that the Executive Officer Defendants went to great lengths to afford TransCanada preferential treatment, Lead Plaintiff fails to explain why. *See Rombach*, 355 F.3d at 170 (providing that the fourth element required to satisfy Rule 9(b) tasks the pleader with explaining "why the statements were fraudulent"). Was there a preexisting relationship between representatives at TransCanada and any of the Executive Officer Defendants? Such reason was never articulated in the complaint. Indeed, if one was uncovered through the voluminous discovery and subsequent trial that took place in the Appraisal Action, Lead Plaintiff would have pled accordingly.

Instead, the facts as alleged suggest that TransCanada presented itself as the strongest contender, and for that reason, Columbia Pipeline viewed it favorably. For example, Lead Plaintiff

asserts that Defendants constantly rebuffed Spectra, (Opp'n at 19), first alleging that the Proxy "misrepresented the details of a telephone call between Skaggs and Spectra's CEO on November 9, 2015 by stating that Spectra 'provided no specifics regarding a potential transaction and did not request a follow-up meeting,'" (*id.*). Lead Plaintiff claims that this omitted the alleged "material fact that Skaggs failed to inform Spectra's CEO that [Columbia Pipeline] was still entertaining bids until November 24, 2015. . . . Thus, the Proxy gave the misleading impression that Spectra was not pursuing a deal with [Columbia Pipeline] when in reality, it was Skaggs who had discouraged Spectra from engaging further." (*Id.* at 19–20.)

Not only is such account not material, it is neither false nor misleading. Though Spectra showed interest in Columbia Pipeline, it never made a formal offer. According to Lead Plaintiff, Spectra's CEO claimed that "it was 'tough to be specific from the outside' because Columbia Pipeline 'hadn't provided much of a public forecast.' He indicated that Spectra '[could] be more specific subject to diligence from Columbia Pipeline.'" (Class Action Compl. ¶ 150.) Dominion, on the other hand, offered a price point for Columbia Pipeline before entering into its non-disclosure agreement, thus granting it access to due diligence materials if desired. (*Id.* ¶¶ 79–80.) Spectra was not required to offer a price point before receiving due diligence materials, but Columbia Pipeline was also not required to wait around. Judge Laster raised a similar point in his Appraisal Action Decision:

> Rather than favoring TransCanada throughout, Columbia initially expected Dominion to be the logical buyer. After TransCanada's unsolicited outreach to Smith in October 2015, Columbia remained focused on Dominion, believing that it could pay more. *See* PTO ¶ 428. In early November 2015, when Dominion said it could not meet the Board's ask of $28 per share, Lazard recommended broadening the process with private outreach to TransCanada, Berkshire, and Spectra to "put pressure on [Dominion]." JX 503 at 2–3. Goldman agreed and recommended conducting a broader market test only if the private process failed to produce a bid materially greater than $24 per share. *See* JX 505.

> The targeted pre-signing process ultimately included Dominion, NextEra, TransCanada, and Berkshire, but not Spectra. The petitioners fault Columbia for not pursuing Spectra, but they failed to prove that more vigorous pursuit "would have produced a better result."

(Appraisal Action Decision at 60.) In response to the differing amounts of due diligence materials that were provided to the bidders, Judge Laster explained:

> The petitioners next claim that Columbia gave more information to TransCanada than to others in November 2015. The simple answer is that the bidders requested different levels of information. Berkshire was the most demanding. TransCanada was next, and both TransCanada and Berkshire asked for redacted precedent agreements. Dominion did not receive them because it did not ask.

(*Id.* at 61.)

The allegations surrounding Spectra thus raise another issue: though Lead Plaintiff alleges a skewed preference for TransCanada, it repeatedly fails to observe that the other bidders, under Lead Plaintiff's standards, may have been the subject of favoritism as well. For example, Columbia Pipeline informed TransCanada *and* Berkshire of the November 24, 2015 deadline for bids. (Class Action Compl. ¶ 96.) Judge Laster explains in his Appraisal Action Decision that TransCanada was not the subject of preferential treatment but was the most desirable option, even before the equity offering:

> By November 22, because of extensive interactions with TransCanada and Berkshire, Columbia management expected imminent indications of interest from those firms. Dominion "ha[d] been radio silent." JX 569. Sure enough, TransCanada and Berkshire made prompt bids, and Dominion did not. The petitioners cite an email from November 25, 2015 in which Dominion's partner, NextEra, expressed surprise when Columbia called off the sale process to pursue an equity offering, saying that the deadline "was news to us—we were working on it." JX 592. Dominion and NextEra knew they had to move quickly, and had they been more interested, they would have. There is no evidence that an expression of interest from Dominion and NextEra would have been sufficiently competitive and sufficiently actionable to cause Columbia to forego the equity offering and agree to a preemptive transaction at a higher value than the Merger.

(Appraisal Action Decision at 62 (emphasis added).)  Judge Laster goes on to explain why Lead

Plaintiff's allegations that Columbia Pipeline favored TransCanada *after* the equity offering were

improbable:

> The petitioners likewise claim that Columbia unduly favored TransCanada after the
> equity offering. *As it did throughout the process, Columbia pursued the best*
> *opportunity.*  Columbia first focused on Dominion. Because of Dominion's
> reticence, Columbia next focused on Berkshire and TransCanada.  After the equity
> offering, Berkshire withdrew for good, calling Columbia's business model
> "fundamentally broken." *See* JX 547.  TransCanada, by contrast, called to express
> continued interest.  That call spurred Smith's meeting with TransCanada in January
> 2016. *See* Smith Tr. 323; *accord id.* at 234.

(*Id.* (emphasis added).)

Even the Lazard representative's discussion with TransCanada about the Reverse Morris

Trust lacks materiality.  All it shows is that representatives of both entities once discussed the

potential tax liability.  Indeed, after these alleged discussions, the Executive Officer Defendants

had discussions with *all* other potential bidders, three of whom—besides TransCanada—entered

into non-disclosure agreements with Columbia Pipeline: Dominion on November 2, 2015,

TransCanada on November 9, 2015, NextEra on November 12, 2015, and Berkshire on November

17, 2015. (Class Action Compl. ¶¶ 81, 86, 92–93.) Accordingly, Lead Plaintiff's complaint does

not demonstrate, and indeed Judge Laster's decision confirms, that the Executive Officer

Defendants' failure to include an alleged preference for TransCanada in the Proxy was not false

and misleading under Section 14(a).

### 3.  TransCanada's Improper Discussions with Columbia Pipeline During Invocation of the Standstills.

The complaint alleges that TransCanada improperly made a bid for $28.00 for Columbia

Pipeline following the close of the equity offering.  (*Id.* ¶ 109.)  As stated above, a fact in a proxy

is material "if there is a substantial likelihood that a reasonable shareholder would consider it

important in deciding how to vote." *Resnik,* 303 F.3d at 151.   Though the existence of the standstills themselves is not material, the fact that TransCanada made an offer for Columbia Pipeline in contravention of its standstill, while the other bidders were still subject to theirs, could be.   In assessing a 14(a) violation, courts normally consider whether a reasonable shareholder would have viewed a factual misstatement or omission as material in tandem with whether there is "a substantial likelihood that the disclosure of the omitted fact" could be "viewed by the reasonable investor as having significantly altered the *total mix* of information made available," that is, whether the disclosure caused the plaintiff's loss (regularly referred to as loss causation). *Bricklayers,* 866 F. Supp. 2d at 238 (internal quotation marks omitted).   "The 'total mix' of information may include data sent to shareholders by a company in addition to its proxy materials, . . . as well as other information 'reasonably available to the shareholders.'" *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993) (quoting *Rodman v. Grant Foundation*, 608 F.2d 64, 70 (2d Cir. 1979).   It "may also include 'information already in the public domain.'" *Id.* at 1199 (quoting *Rodman,* 608 F.2d at 70).

Courts in this circuit have held that a material misstatement or omission *did* alter the total mix of information made available when, for example, information was clearly left out of the proxy or cursorily described to influence the shareholders' decision. *See id.* at 1200 (finding there could "be no serious question here that the Proxy Statement standing alone was materially misleading with respect to the Company's environmental record" because its representations conveyed an impression that was entirely false.   The company's annual report contained "misleadingly self-laudatory statements" in "major headings," while burying negative information in other sections). Courts have also held as such when the event purporting to alter the total mix was viewed as "substantial," not inconsequential.   *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir.

1990), *amended,* 938 F.2d 1528 (2d Cir. 1990). In *Mendell,* the court decided, at the summary judgment stage, "that the fact that [a] . . . family had incurred substantial estate tax liability [wa]s not so inconsequential as to allow summary judgment on the issue of materiality" because "[a] reasonable shareholder made aware of this liability could deduce that the . . . family desired a 'quick sale' for estate tax purposes." Therefore, "the majority stockholder's urgent need for cash, coupled with the control such a stockholder is able to exercise over the affairs of the company, [could have] caused the Board of Directors to endorse a sale below the stock's value, the financial appraisal contained in the proxy statement notwithstanding."

On the other hand, courts have held that a misstatement or omission did *not* alter the total mix of information made available when, for example, the information was considered "minute." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009) ("Here, the . . . transactions . . . were . . . 'a minute fraction of assets'" that "would not have materially altered the 'total mix' of information available to investors"). Another example is when the alleged conduct had no impact on the stock. *See Hecco Ventures v. Avalon Energy Corp.*, 606 F. Supp. 512, 516–17 (S.D.N.Y. 1985) ("Hecco has failed to demonstrate that Deltec's purchases had any impact on the price of Avalon stock. . . . Based on the evidence submitted, Hecco has failed to prove that Deltec's purchases were a material factor affecting the market price of Avalon's stock at any time. There is no basis, therefore, for requiring the disclosure of these purchases."). Lastly, courts have found that an undisclosed relationship—and the timing of such relationship—was "significant," but not so material as to alter the total mix. *Id.* at 517 (in denying injunctive relief based on the plaintiff's failure to prove a likelihood of success on the merits, the late Judge Robert W. Sweet found that the defendants' alleged failure to fully disclose the interests and relationships of officers and directors of two merged entities, as well as the time

at which a director became associated with a large stockholder, were "significant . . . but d[id] not constitute . . . material omission[s], given the 'total mix' of information provided.").

*Hecco* is the most factually analogous to the case at hand. In that case, the plaintiff contended that the proxy statement failed to "fully disclose the degree of involvement between" the directors and officers of the merged entities discussed in the proxy, falsely described certain officers and directors' roles, and suggested that the proxy "should have disclosed the existence and history of certain agreements." 606 F. Supp. 512, 517 (S.D.N.Y. 1985). Judge Sweet found that "[t]aken as a whole, the Proxy Statement set out the nature and extent of the relationship[s]" because "[t]here was no requirement that the Proxy Statement do more than set forth the relationship between" the merged entities, and also found that any further disclosure would not affect the decision of the shareholders. *Id.* at 517–18.

Though *Hecco* differs in that it was decided under the preliminary injunction standard, Judge Sweet's findings regarding the question of materiality in view of the total mix of information available still applies. Defendants provided significant detail regarding its dealings with Spectra, Dominion, NextEra, TransCanada, and Berkshire in the Proxy. A proxy is not required to disclose every single communication that a company had with bidders and interested parties. "The SEC requires that shareholders of a company whose securities are registered under Section 12 of the Securities Exchange Act of 1934 receive a proxy statement prior to a shareholder meeting." U.S. SEC. & EXCH. COMM'N, PROXY STATEMENT (last modified Sept. 8, 2011), https://www.sec.gov/answers/proxy.htm (last visited Sept. 19, 2019). The information contained within "must be filed with the SEC before soliciting a shareholder vote on the election of directors and the approval of other corporate action[, and] must disclose all important facts about the issues on which shareholders are asked to vote." *Id.* "Issues covered in a proxy statement can include

proposals for new additions to the board of directors, information on directors' salaries, information on bonus and options plans for directors, and any declarations made by the company's management." *Proxy Statement*, INVESTOPEDIA (updated May 22, 2019), https://www.investopedia.com/terms/p/proxystatement.asp.   A proxy thus serves as an information-sharing tool that must disclose *important facts*.   The facts at hand are much more similar to the line of cases finding that the information was not so material so as to alter the total mix.   The Proxy adequately alleged that the competing bidders were no longer interested and that TransCanada was.   (Proxy at 39.)   Though TransCanada made an offer of $28.00 per share immediately following the equity offering in contravention of the standstills, this does not affect the truth of this statement, does not change the fact that the other bidders never intended to bid on Columbia Pipeline following the equity offering, (Appraisal Action Decision at 60, 62), and likely would not be of import to the reasonable investor given the total mix of information made available to them about the other bidders' interest.[7]   TransCanada's improper discussions with Columbia Pipeline during invocation of the standstills was not so material as to alter the total mix of information available.

### 4. The Change-in-Control Benefits and the Executive Officer Defendants' Intent to Retire.

Lead Plaintiff argues that "the Proxy omitted material facts demonstrating the Executive Officer Defendant's [*sic*] rush to sell the Company and retire. . . .   The undisclosed facts demonstrating Defendants' motive to sell [Columbia Pipeline] before expiration of the lucrative change-in-control benefits was material information that should have been disclosed to [Columbia Pipeline] shareholders."   (Opp'n at 23–24.)   Defendants, on the other hand, contend that "[t]he

---

[7] As an aside, the non-disclosure agreement between Columbia Pipeline and TransCanada was amended to permit TransCanada personnel to perform due diligence, so any purported breach was short lived.   (Class Action Compl. ¶¶ 122–124, 126.)

Proxy disclosed in great detail the [Columbia Pipeline] stock rights held by Skaggs, Smith, and Kettering . . . along with the benefits that they would receive through change-in-control agreements. . . .   Indeed, [Columbia Pipeline's] shareholders expressly approved, in a separate advisory note, 'the compensation that [Columbia Pipeline's] named executive officers may be entitled to receive from [Columbia Pipeline] that is based on or otherwise relates to the merger.'" (Defs.' Mem. at 16 (citing Proxy at 76–77, 79–81, 110, 113–14.)   Judge Laster seemingly agrees with Defendants' interpretation, finding that "[a]lthough Kettering retired after the Merger and received change-in-control benefits, the evidence does not support the contention that he pushed for an early sale."   (Appraisal Action Decision at 53 n.30.)   With regard to Skaggs and Smith, Judge Laster provided a detailed account of these Defendants' conduct and states of mind, similarly finding that they did not push for an early sale:

> Although Skaggs and Smith wanted to retire, they were professionals who took pride in their jobs and wanted to do the right thing.  They were not going to arrange a fire sale for below Columbia's standalone value, and the Board would not have let them.

> Consistent with their incentives and professional responsibilities, Skaggs and Smith rejected opportunities for a quick sale.  When Dominion expressed interest at an all-time high valuation, Skaggs demanded more.  Instead of taking what they could get from Berkshire or TransCanada in fall 2015, Skaggs and Smith recommended a dilutive equity raise. JX 534; JX 1399 at 2–3.  When Columbia told TransCanada that it was pursuing the equity raise, Girling offered a prompt deal at a higher price. JX 588.  Skaggs thought that was too risky for Columbia and declined.  A Columbia director recognized that by pursuing the equity raise, Skaggs and Smith had opted for "BIG, at least near, financial hits to your net worth."  JX 621.

> When negotiations with TransCanada resumed, Skaggs remained focused on obtaining a fair price.  While awaiting TransCanada's formal offer in February 2016, Skaggs told Cornelius that "if the cash portion of the initial salvo [is] below $25, I would be inclined to not even counter."  JX 855.  When TransCanada offered $24, Skaggs and Smith said it was a nonstarter.  See PTO ¶ 563. TransCanada came back at $25.25, and Skaggs recommended that the Board reject it. JX 1399 at 10; Skaggs Tr. 908–10; see Cornelius Tr. 1142–43.  The Board agreed, and after Skaggs told Girling, Lazard and Skaggs believed the deal had died and that Columbia would be proceeding with its standalone plan.  See JX 901; JX 906; JX 913.

> The most troubling event in the deal timeline is Smith's one-on-one meeting with Poirier, when he explained that TransCanada lacked competition. But Columbia did not take TransCanada's $24 per share offer, or even its $25.25 offer. Skaggs and the Board held out for a higher price, ultimately obtaining the Merger consideration of $25.50.

(*Id.* at 57–58.) Therefore, after much fact-finding at trial, Judge Laster found that the Executive Officer Defendants did not rush to a sale to quickly retire and recoup their change-in-control benefits as Lead Plaintiff suggests. The Proxy was therefore neither false nor misleading in failing to disclose such. Moreover, as Defendants contend, the Proxy disclosed the change-in-control benefits and golden parachute compensation, which the shareholders separately approved. (Defs.' Mem. at 16 (citing Proxy at 76–77, 79–81, 110, 113–14); *see also* Ex. I (Glass Lewis) (recommending that the shareholders vote in favor of the proposed merger and golden parachute compensation); Ex. J (ISS Proxy Analysis & Benchmark Policy Voting Recommendations for Columbia Pipeline Group, Inc., 2016) (finding that support for the merger was warranted "in light of the market's positive reaction, the meaningful premium, and the strategic rationale," and also providing that the golden parachute payments were "reasonable relative to the" approximately $10.2 billion transaction equity value).)

Further, though Lead Plaintiff argues that the Executive Officer Defendants intended to retire after the Merger, such facts, even if material, would likely not significantly alter the total mix. The Proxy provided and, indeed, Judge Laster confirmed that the Executive Officer Defendants carefully and selectively negotiated with all potential bidders, such that the intent of the Executive Officer Defendants to retire would not significantly affect their disclosures, or "cause" a purported loss.[8]

---

[8] Because Judge Laster found that "[t]he fair value of Columbia [Pipeline's] stock . . . was $25.50 per share," the argument can be made that there was no purported loss.

## V.     THE SECTION 20(A) CLAIMS ARE DISMISSED AGAINST ALL DEFENDANTS

Because the claims against all Defendants were dismissed under Section 14(a), they are similarly dismissed as to Section 20(a). *Tiberius Capital, LLC*, 2011 WL 1334839, at *8 ("Having failed to allege an underlying securities violation by [the defendant] pursuant to . . . Section 14(a) and Rule 14a–9, Plaintiffs' control liability claim is defective. Accordingly, Plaintiff has failed to state a claim under Section 20(a).").

## VI.     LEAD PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIMS ARE DISMISSED

Lead Plaintiff argues that "Defendants waived their venue objection by consenting to the transfer of Lead Plaintiff's action to this Court." (Opp'n at 28.) Defendants assert that "[t]he forum-selection clause is enforceable and precludes Lead Plaintiff from litigating fiduciary duty claims here," and that venue lies with the Delaware Chancery Court pursuant to Federal Rule of Civil Procedure 12(b)(3). (Defs.' Mem. at 28 (citing *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 938–41, 950–63 (Del. Ch. 2013); *City of Providence v. First Citizens Bancshares, Inc.*, 99 A.3d 229, 233–36 (Del. Ch. 2014); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445, 459–63 (S.D.N.Y. 2013). Defendants also note that "fiduciary duty claims were already dismissed by the Delaware Chancery Court in the First Delaware Fiduciary Action, and are being litigated there again in the Second Delaware Fiduciary Action. Even if this Court were otherwise a proper forum (and it is not), there is no need for this Court to exercise supplemental jurisdiction over the same Delaware law claim, particularly if Lead Plaintiff's federal claims are dismissed." (*Id.* at 29 (citing 28 U.S.C. § 1367(c)(3)–(4) (providing that district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction" or if "there are other compelling reasons for declining

jurisdiction"); *S. New England Tel. Co. v. Comcast Phone of Conn., Inc.*, 718 F.3d 53, 61 (2d Cir. 2013) ("We believe that this question [already being litigated in state court], arising under Connecticut law, is appropriately considered in the first instance by its courts.") (alterations in original).

Plaintiffs representing the Class brought an identical breach of fiduciary duty claim in the First Delaware Fiduciary Action, which the Delaware Chancery Court dismissed on March 7, 2017. (*See generally* Defs.' Mem., Ex. C (Order Granting Mot. to Dismiss, First Delaware Fiduciary Action). Noting that the proper inquiry was "whether the stockholder vote was fully informed" after it "approved [a] conflict of interest," the court found that "[t]he Proxy disclosed that the Company took steps before the completion of the spinoff to prepare for potential acquisition offers," properly "described that on August 3 and 4, 2015, the Board engaged in a comprehensive review of the Company's strategic alternatives, provided a detailed description of the material steps in the process leading up to the Merger Agreement in March 2016," and also "disclosed that the total value of change-in-control benefits that Skaggs and Smith earned through the TransCanada merger was higher than the benefits those individuals would have received if NiSource had sold the Company without a spinoff." (*Id.* at 6–7.) Plaintiffs in that matter, however, "contended that the defendants were obligated to disclose that they acted for selfish and self-interested reasons." (*Id.* at 7.) The court found that "[t]o require the defendants to aver that they acted for that purpose, assuming it were true, would be to force them to engage in self-flagellation," which is more than "Delaware law requires." (*Id.*) Accordingly, the court found that the material facts were disclosed. (*Id.*)

Even if this Court might agree, a determination from the Delaware Chancery Court—indeed, the proper court—is much more appropriate, especially in light of the breach of fiduciary

duty action currently pending there.[9] (*See* Second Delaware Fiduciary Action).  Because this Court finds no need to exercise supplemental jurisdiction over a claim that is currently being litigated in its proper court, Lead Plaintiff's breach of fiduciary duty claims arising under Delaware common law are dismissed.

## VII.    CONCLUSION

Defendants' motion to dismiss, (ECF No. 42), is GRANTED.[10]  The Clerk of Court is directed to close the motion accordingly.

Dated: September 26, 2019
       New York, New York

SO ORDERED.

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

---

[9] Plaintiffs' fifth bite of the apple.

[10] Lead Plaintiff may submit a letter application to further amend its complaint with a proposed amended complaint attached if such amendment would not be futile.